IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LUIS FELIPE MORENO-GODOY,                )
                    Plaintiff,           )    14 CV 07082
                                         )
vs.                                      )    Case No. _____
                                         )
GALLET DREYER & BERKEY, LLP,             )
ROGER L. STAVIS, ESQ., AND               )
STEVEN R. KARTAGENER, ESQ.,              )
                    Defendants.          )

PLAINTIFF'S CIVIL COMPLAINT WITH JURY DEMAND PURSUANT

TO 28 USC § 1331 and 1332

COMES NOW THE PLAINTIFF ("Godoy"), pro-se, who brings this complaint against Gallet Dreyer & Berkey, LLP, ("the Firm"), Roger L. Stavis, Esq., ("Stavis"), and Steven R. Kartagener, Esq., ("Kartagener") for claims of (1) Breach of Contract; (2) Breach of Fiduciary Duty; and (3) Malpractice. The Plaintiff seeks $500,000 in Compensatory and Punitive Damages.

STATEMENT OF JURISDICTION

This Court has jurisdiction over this matter under 28 USC § 1331 and 1332. Pursuant to § 1331, the District Courts have original jurisdiction of all civil actions arising under the Constitution, laws, or treatise of the United States. This complaint states several claims that fall within that perimeter. This Court also has jurisdiction under § 1332 because there is diversity among the parties and the amount in controversy exceeds the amount of $75,000.

## TABLE OF CONTENTS

SECTION                                                      PAGE#

STATEMENT OF JURISDICTION ....................................... 1

TIMELINESS OF THE COMPLAINT .................................. 3-5

THE RELEVANT BACKGROUND INFORMATION ......................... 5-18

## THE COMPLAINT

1). BREACH OF CONTRACT ...................................... 18-25

    i. Roger L. Stavis, Esq. ............................ 19-23

   ii. Gallet Dreyer & Berkey, LLP ...................... 23

  iii. Steven R. Kartagener, Esq. ...................... 23-25


2). BREACH OF FIDUCIARY DUTY .............................. 25-31

    i. Roger L. Stavis, Esq. ............................ 26-30

   ii. Gallet Dreyer & Berkey, LLP ...................... 30

  iii. Steven R. Kartagener, Esq. ...................... 30-31


3). MALPRACTICE ........................................... 31-34

    i. Roger L. Stavis, Esq. ............................ 31-33

   ii. Gallet Dreyer & Berkey, LLP ...................... 33-34

  iii. Steven R. Kartagener, Esq. ...................... 34


IN CONCLUSION WITH DAMAGES REQUESTED ........................ 34-35

---

    *Please note that all exhibits referenced herein are attached to the end of this complaint and labeled according to their assigned letter. Id.

TIMELINESS OF THE COMPLAINT

The date the cause of action accrued in this case is on January 29, 2010, and continues to present day. In determining the relevant limitation periods in this case it is the governing State law where the conduct occurred that is controlling. See Stuart v. American Cyanimid Co., 158 F.3d 622 (2nd. Cir. 1998)("As a federal court sitting in New York, and exercising diversity jurisdiction, New York State choice of law rules and statutes of limitations govern this case."); See also Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).

In the State of New York a cause of action stating Breach of Contract and Breach of Fiduciary claims that sound in fraud are governed by a 6-year statute of limitation period. See Kyrs v. Surgue, 2012 U.S. Dist. LEXIS 19915 (2/10/12 S.D.N.Y.)("A cause of action for breach or aiding and the abetting the breach of fiduciary duty - if sounding in fraud - is governed by the six year statute of limitation period. Where an allegation of fraud is essential to a breach of fiduciary claim, the courts have applied a six year limitations under N.Y. C.P.L.R. § 213(8).").

In the instant case, Godoy's Breach of Fiduciary and Breach of Contract claims, sounding in fraud, and being filed less than 5 years from the earliest date of accrual, are timely. Id.

As it applies to Godoy's malpractice claim, under New York law an action for professional malpractice, either legal or accounting, must be commenced within three years from the date of accrual. N.Y. C.P.L.R. § 214(6). A claim accrues when the malpractice claim is committed, not when the client discovers it. See Arnold v. KPMG LLP, 334 Fed. Appx. 349 (2nd Cir. 2009).

Godoy's malpractice claim being filed more than 3 years after the claim was committed would ordinarily be untimely. However, the "continuous representation doctrine" holds that the statute of limitations period in a legal malpractice claim is tolled while the attorney continues to represent the client in the same matter underlying the malpractice claim. See De Carlo v. Ratner, 204 F.Supp. 2d 630 (S.D.N.Y. 2002)("The continuous representation doctrine applies where there is evidence of an ongoing, continuous, developing, and dependant relationship between client and attorney."); See also Kretnaya v. Tylo, 44 A.D. 3d 608, 854 N.Y. S.2d 425, 2008 N.Y. App. Div. LEXIS 2145 (2008)(Citing Shumskey v. Eisenstein, 96 N.Y. 2.d 164, 167-68 (2001)("Continuous representation doctrine requires that the parties possess a mutual understanding of the need for representation on the specific matter underlying the malpractice claim.").

In this respect, Stavis continuously represented Godoy under the Firm's letterhead on the specific subject matter of the malpractice claim from December 9th, 2008, (the signing of the appeal related contract) until May 14, 2012, when the Supreme Court denied Godoy's Writ of Certiorari. See Al Kassar v. United States, 182 L.Ed 2d 1017 (5/14/12). As such, the 3-year limitation period for the malpractice claim did not start to run until May 14, 2012, making Godoy's malpractice claim timely filed prior to May 14, 2015.

For all the aforementioned reasons, Godoy asserts that all of his claims are timely under their respective statutes of limitation periods.

-4-

THE RELEVANT BACKGROUND INFORMATION

In 2007, the Plaintiff ("Godoy") and his co-defendant ("AL Kassar") were indicted in the Southern District of New York for numerous crimes related to weapons trafficking. See United States v. Al Kassar, No. 07-Cr-354 (JSR) (S.D.N.Y.).

During these pre-judgment proceedings, Godoy and Al Kassar were jointly represented by [paid] Attorneys Roger L. Stavis, of Gallet Dreyer & Berkey, LLP, and Ira Lee Sorkin, of Dickstein Shapiro, LLP. Id.

After a disfavorable November 20, 2008 jury verdict finding both defendants guilty of all counts, it was agreed per contract under the Gallet Dreyer & Berkey letterhead that for an additional "flat fee" of $125,000, attorney Stavis ("the Firm") would provide all post-verdict direct appeal proceedings for [both] defendants. The contract specifically states that when countersigned by the defendants and after payment of the $125,000 "flat fee" that:

> "This flat fee will cover all post-verdict legal
> services provided in connection with this matter,
> including, but not limited to: sentencing, appeal
> of conviction to the Second Circuit, and petition
> for a writ of certiorari to the United States
> Supreme Court. It will include all appellate filing
> fees and printing costs. The only expenses and dis-
> bursements not included within the legal fee to be
> paid will be travel and lodging expenses."
> (See attached Exhibit A at 1).

On December 9, 2008, both Godoy and Al Kassar signed this contract and the $125,000 "flat fee" was immediately thereafter paid in full on both defendant's behalfs. [1]

Not long after the signing of this contract, Godoy decided that he wanted an [additional] third attorney with a fresh set of eyes to work with Stavis and Sorkin on appeal. (As set forth below Sorkin was also hired to jointly represent the defendants on appeal for a separate $100,000 fee.). Id.

To fund this [third] attorney, Godoy had co-defendant Al Kassar's family liquidate his only assets in Spain while Roger Stavis considered potential candidates. Stavis ended up recommending his friend, attorney Steven R. Kartagener, who said he could handle the complex and classified information issues in the case.

Based on this advice both Godoy and Al Kassar signed another contract with Kartagener on February 11, 2009, where in return for a "flat fee" of $100,000 he agreed to jointly represent both co-defendants as a [third] attorney in the Second Circuit and Supreme Court proceedings. (See attached 2/11/09 Contract at 1, attached Exhibit B).

Mr. Kartagener was immediately paid the required retainer by a third party, on both defendant's behalfs, but with Godoy's money. Mr. Kartagener then allegedly applied for clearance to handle the classified information, but after the appeal had been put off for an entire year, the defendants were informed by Stavis that due to some "tax thing" Kartagener was unable to get cleared to handle the classified information in the case, and there-fore would be unable to represent the defendants on appeal. (See Stavis's 1/29/10 Letter, attached Exhibit C).

---

1. It should be noted that Ira Lee Sorkin, of Dickstein Shapiro, LLP, was also hired per contract to jointly represent both co-defendants on appeal for a separate "flat fee" of $100,000, as a second appeal attorney. Id.

This <u>January 29, 2010</u> letter is the first instance where Stavis [openly] and intentionally misrepresented the circumstances in an attempt to manipulate the defendants into allowing him to keep the additional $100,000.

Although Stavis had already entered into a contract with both defendants where in return for the already paid "flat fee" of $125,000 he agreed to jointly represent them at sentencing and on appeal to the Second Circuit and Supreme Court, he now claimed that: "When we first started talking about appeals, we were talking about having me represent the both of you and then you decided that you wanted someone new." Stavis even used the fact that the appeal had already been delayed for an entire year as leverage, stating: "I thought it preferable for me to be your lawyer because I know the case; already have security clearance; and can file the brief quickly so you don't lose any more time." (<u>See Stavis's 1/29/10 Letter, attached Exhibit C</u>).

As stated above, this version of the facts was an intentional manipulation as Stavis and Sorkin had already agreed and been paid to jointly represent both defendants on appeal, and Kartagener was only hired as a [third] attorney with a fresh set of eyes. That said, Godoy immediately became suspicious and angry with Stavis because it was obvious that he was trying to manipulate them into allowing him to keep the original $100,000 as if he had not already been paid to do the job, and like he would be earning the additional money because it was going to be more work than expected. Two positions that are completely frivolous in light of the binding contract signed in this case, and the fact that the lawyers raised the same exact trial defenses and objections for [both] defendants, and filed "duplicate briefs on appeal."

Indeed, the direct appeal briefs filed by Stavis for the defendants were exact duplicates in that they raised the same legal arguments word for word. See United States v. Al Kassar, 660 F.3d 108 (2nd Cir. 2008). So it cannot be reasonable concluded that it was "more" work for Stavis to represent both Al Kassar and Godoy on appeal, which is very likely why Stavis ("the Firm") agreed to represent both defendants for a "flat fee" of $125,000.

In any event, at this time Godoy was unaware that Stavis had already relinquished Kartagener of his $100,000 fee, and Godoy sent Kartagener a letter dated February 7, 2010, requesting that he immediately return the $100,000 to the people that made payment on his behalf. (See 2/7/10 Letter to Kartagener, Exhibit D). But Kartagener never returned the money or responded to Godoy's letter.

After a week went by and Godoy still had not heard back from Kartagener, he sent Stavis a letter dated February 13, 2010, explaining that his delay in answering Stavis's January 29, 2010 letter was because he was waiting to hear back from Kartagener about reimbursement of his funds. Godoy then went on to set Stavis straight about the billing agreement, pointing out that he had already been paid per contract to jointly represent him and Al Kassar on appeal for a "flat fee" of $125,000. Godoy then reminded Stavis that Kartagener had only been hired as a [third] attorney with a fresh set of eyes, and noted his concern in getting back the $100,000 retainer paid to Kartagener as he would not respond to his letters. (See 2/13/10 Letter to Stavis, attached Exhibit E).

In response to Godoy's 2/13/10 letter, Stavis sent Godoy the attached February 23, 2010 letter, where he openly admits that he had relinquished

Kartagener of the $100,000 retainer; lying that he had consulted with the person who provided Kartagener's $100,000 retainer and claiming that this "person" already knows that Kartagener refunded the money to him (Stavis), and that he would be using it to represent Godoy on appeal (like it was this alleged "persons" decision to make and not Godoy's). Stavis also continued to ply his overall fraudulent scheme by refusing to acknowledge Godoy's mention of the fact that he had already agreed and been paid to jointly represent both defendants on appeal for the flat fee of $125,000, and continued to make it out as if he was just now becoming Godoy's attorney of record. (See Stavis's 2/23/10 Letter, Exhibit F). [2]

To further perpetuate his fraudulent scheme, Stavis sent Godoy a copy of a letter and "Notice of Appearance as Substitute Counsel for Kartagener" that was allegedly filed in the Second Circuit. (See Stavis's 2/25/10 Letter and Notice, attached Exhibit G).

However, Stavis had never filed a Motion to Withdraw as Counsel of Record and Kartagener had never filed a Notice of Appearance as Substitute Counsel for Stavis. That is, as this Court will clearly see after reviewing the Docket Sheet, Stavis filed his initial "Notice of Appearance" for Godoy on January 10, 2008, and never filed a "Motion to Withdraw as Attorney of Record." Nor does the record reflect that Kartagener ever filed the required "Notice of Appearance as Substitute Counsel" for Godoy. (See Court's Docket Sheet in Case No. 07-CR-354 (JSR)).

In fact, it was Stavis who filed the "Notice of Appeal" and paid the $455.00 filing fee as promised by the contract he signed with Godoy; (See

---

2. Obviously Stavis felt that there was more money to be paid in attorney fees that it should come to him and not be returned.

Docket Sheet Entry #123, Case No. 7-CR-354 (JSR); see also 12/08/09 Contract at 1, Exhibit A).

As Stavis well knew, any motions regarding change of counsel must be filed in the District Court, and because neither him nor Kartagener ever filed any motions in this respect, Stavis remained attorney of record. (See Childs v. Herbert, 146 F.Supp. 2d 317 (S.D.N.Y. 2001)(Noting that: Local S.D.N.Y. Rule 1.4 provides that an attorney who has appeared as attorney of record for a party must be relieved or displaced [only] by order of the Court and may not withdraw from a case without leave. Moreover, such an order be granted [only] upon a showing by affidavit or otherwise of satisfactory reasons for withdrawal and the posture of the case, including its position on the calendar. The Court further noted that because attorney of record had not filed the required affidavit in support of withdrawal and no Court order had relieved her as counsel, and she had proceeded as if she was representing client - she remained counsel of record.

Stavis was and had been Godoy's attorney of record since January 10, 2008, a fact that he knew quite well. Thus, his frivolous "Notice of Appearance as Substitute Counsel" to the Second Circuit was nothing more than an additional step taken in the furtherance of his fraudulent scheme, attempting to make it appear as though he had just then been hired to represent Godoy on appeal. Id.

Being completely frustrated and irate with Stavis at this point, Godoy contacted his co-defendant Al Kassar explaining the situation. Al Kassar then sent Stavis a letter dated March 22, 2010, where he explained that as he had already told him in his letter dated January 28, 2010, the

money paid to Kartagener was Godoy's, and therefore he agreed with what-
ever Godoy agreed. Al Kassar also pointed out that Stavis had already agreed
and been paid a flat fee of $125,000 to represent both defendants on appeal.
Stavis responded to this letter on March 30, 2010, referencing portions of
Al Kassar's letter, but erroneously claiming in the face of the previous
correspondence that both defendants had agreed to let him take and keep
Kartagener's $100,000 retainer. Stavis also tried to make it out as if it
was more work to represent both defendants on appeal even though he had al-
ready filed "exact duplicate" briefs for both of them. (See Stavis's 3/30/10
Letter, attached Exhibit H).

Godoy then immediately sent Stavis a certified letter dated April 9,
2010, asserting that Stavis was mistaken about them agreeing to allow him to
obtain and keep the $100,000 and demanding that it be immediately returned.
(See 4/9/10 Letter to Stavis from Godoy, attached Exhibit I).

But before Stavis received Godoy's 4/9/10 letter, he sent Godoy a letter
dated April 12, 2010, where he again intentionally misrepresents the facts
as being that the defendants both agreed to allow him to obtain and keep the
money paid to Kartagener, and again frivolously maintains that it was going
to be more work to represent both defendants on appeal. (See 4/12/10 Letter
from Stavis to Godoy, attached Exhibit J).

The very next day Stavis received Godoy's 4/9/10 letter and sent a
response dated April 13, 2010. In this response Stavis just straight out
asserts that he will not return Kartagener's $100,000 retainer. (See Stavis's
4/13/10 Letter to Godoy, attached Exhibit K).

Godoy then sent two more letters to Stavis where he again reiterated
his position that as Stavis well knew the $100,000 paid to Kartagener was

-11-

only funded for a [third] attorney up and beyond Stavis and Sorkin, who
had already been paid a total of $225,000 to jointly represent the defend-
ants on appeal. Godoy also pointed out that Stavis had [not] been authorized
to obtain this money from Kartagener and Kartagener had not been authorized
to release this money to Stavis. (See Godoy's 4/26/10 and 5/10/10 Letters to
Stavis, Exhibit L).

Indeed, on one of the very same dates (4/26/10), Godoy also sent Kart-
agener a letter pointing out that he had [not] been given permis-
sion to release his $100,000 retainer to Stavis and demanding that the money
be returned. Godoy also notified Kartagener that: "If for any reason(s) you
will not or cannot do this, please state your reasons in writing. However,
if you fail to return the retainer I will be forced to file a Complaint with
the New York Bar Association, as well as a Civil Action in the United States
District Court." (See 4/26/10 Letter to Kartagener, attached Exhibit M).

Neither Stavis nor Kartagener responded to the April 26, 2010 or May
10, 2010 letters, and with the appeal already in motion and no money to hire
additional Counsel, Godoy was forced to let Stavis solely represent him on
appeal.[3]

After the appeal process had concluded, Godoy filed a 28 USC § 2255
Motion alleging numerous errors of ineffective assistance. As it applies to
this matter, in § 2255 Claim 12, Godoy argued that Stavis was ineffective

---

3. It is important to reiterate that Stavis's representation on appeal
is also at issue in this Complaint as well as in Godoy's pending 28 USC §2255
Petition. (See Docket No. 13-CV-2383 (JSR)(GWG)). That is, although Stavis has
frivolously maintained that it was more work to jointly represent Al Kassar
and Godoy on appeal, he filed exact "duplicate briefs" on their behalfs, despite
the fact that Godoy had separate meritorious claims that if had been raised were
likely to succeed on appeal.

for violating his right to attorney of choice by failing to return the
$100,000 so that he could hire a different attorney. (See § 2255 Memo at 137-143, Reply to Government's Response at 70-79, and Objections to Magistrate's
R&R at 27-32). And in § 2255 Claim 13 Godoy argues that Stavis was ineffective
for failing to make separate and distinct arguments to the jury and Appeals
Court that he was not a knowing participant in a Conspiracy to Sell a Terrorist
Organization Weapons. (See § 2255 Memorandum at 143-147 and Objections to
Magistrate's R&R at 32-37).

In addition, Godoy argued in § 2255 Claims 6-7, that Stavis was ineffect-ive for failing to call two crucial expert witnesses during trial just because
of a fee dispute. Godoy pointed out that both experts had been authorized and
funded by co-defendant Al Kassar, and that there was a pattern in this case
indicating that the attorneys were more concerned with keeping as much money
for themselves as possible rather than providing meaningful defenses for their
clients. Godoy also pointed out in his Reply to the Government's Response and
Objections to Magistrate's R&R that the Affidavit provided by Stavis was per-jured, as clearly shown by the record. (See § 2255 Memorandum at 78-102,
Reply to Government's Response at 31-37, and Objections to Magistrate's Report
and Recommendation at 11-18).

Indeed, Stavis was ordered by the Court to provide an Affidavit answering
Godoy's allegations about, inter alia, taking and keeping Kartagener's $100,000
retainer without permission. Before providing this Affidavit, Stavis sent
an e-mail to co-defendant Al Kassar where he again tried to persuade Al Kassar
into agreeing that it was he who paid the additional $100,000 and gave Stavis
permission to take it from Kartagener. (See attached E-mail Correspondence
Between Stavis and Al Kassar forwarded to Godoy on 7/6/13, attached Exh. N)

However, this attempted deception failed when Al Kassar responded to Stavis's e-mails correctly pointing out that as he had already told him in previous correspondence, such as that responded to by Stavis in his attached March 30, 2010 letter, Stavis had already been paid to jointly represent both Godoy and Al Kassar for a "flat fee" of $125,000, and also that he had told Stavis that he was happy with whatever Godoy decided as it was his money and therefore his decision to make. See Attached Exhibit N, where Al Kassar responds that.....

> "Roger, I am sad and disappointed that you are continuing to have disagreement with Felipe. I wish that you had resolved these problems about the money prior which I have been asking you to do through all of this time. Please let me know what you think you can do about it. I have gone back through all of the correspondence and contracts since December 9, 2008, between you, me and Felipe. And reading the contract signed by the three of us... on December 8, 2008, it is crystal clearly shown that you agreed to represent both Felipe and me on these appeals for a flat fee of $225,000, as best as I can recall, for which Mr. Sorkin received $100,000 for no reason and I told you that I did not want him to do anything further on my appeals. When this contract with you was signed on December 9, 2008, it was not contemplated that Mr. Steven R. Kartagener would be hired to assist you. After this date, Felipe wished to have another attorney to assist or serve as consultant. You recommended your friend, Mr. Steven R. Kartagener and as a result, a separate contract was signed with him on February 11, 2009 between me, Felipe and him. My family then sent to his account $100,000.
>
> My observation is that Mr. Kartagener never consulted with me, Felipe, or the family before he sent you the $100,000.

When I spoke to you on the telephone from Estille on
February 4, 2010 via your request, and you told me that
Mr. Kartagener had a tax problem and could not defend
Felipe, I asked you to tell Mr. Kartagener that he return
the money to us. I hope that you have a record or tape
recording of this conversation possibly the prison has it
still.

Please read my handwritten letter of April 5, 2010 addres-
sed to you and Felipe which explains all of this very
clearly. If you do not have a copy, I do have one and will
send you a copy of it gladly.

All of my correspondence regarding this matter always said
that I would be happy with whatever you and Felipe agreed
to. To my knowledge, you never reached an agreement with
Felipe and contrary to what your letter of April 13, 2010
says, I was never asked nor did I particularly agree for
Mr. Karatagener to send you his fee, or for you to take
possession of it. If you have records of when you received
it from Mr. Kartagener, it will clarify these matters or in
the alternative, any specific instructions from me."
(See attached Exhibit N).

    In reply to this e-mail Stavis wrote back to Al Kassar once again try-
ing to ply his fraudulent version of the events in hopes of getting Al Kassar
to agree, or at least create additional record making it look as though it
was the defendants who were lying. (See attached E-mail Correspondence for-
warded to Godoy on 7/18/13, attached Exhibit O). But once again, Al Kassar
set him straight properly asserting that it was not his money, but Godoy's
money sent by Al Kassar's family because Godoy had left his only assets in
Spain. Al Kassar further reiterated that Stavis had already been paid to
jointly represent both defendants per the December 9, 2008 contract and
noted that he had repeatedly told Stavis that it was Godoy's decision to
make. (See attached Exhibit O.)