UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                      :
LUIS FELIPE MORENO-GODOY,                             :
                                                      :
                                    Plaintiff,        :          14 Civ. 7082 (PAE)
                                                      :
                                                      :          OPINION & ORDER
                        -v-                           :
                                                      :
GALLET DREYER & BERKEY, LLP, ROGER L.                 :
STAVIS, ESQ., and STEVEN R. KARTAGENER, ESQ.,         :
                                                      :
                                    Defendants.       :
                                                      :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/30/15

PAUL A. ENGELMAYER, District Judge:

This case involves a lawsuit by a convicted defendant, principally asserting that his

appellate counsel misapplied $100,000 of a retainer fee.

On August 4, 2014, plaintiff Luis Felipe Moreno-Godoy ("Godoy"), proceeding *pro se*,

filed a civil complaint, Dkt. 1 (the "Complaint" or "Compl."), bringing claims against both the

counsel that represented him, and a lawyer who attempted unsuccessfully to represent him, in his

criminal appeals. His core claim is that he paid a $100,000 retainer to Steven R. Kartagener,

Esq., (the "Kartagener retainer") to join his existing appellate team, but that, when Kartagener

determined that he could not represent Godoy, Kartagener did not return the retainer. Rather,

Godoy alleges that, without his consent, Kartagener paid the $100,000 to another of Godoy's

appellate attorneys, Roger L. Stavis, Esq., of the law firm Gallet Dreyer & Berkey, LLP

("GDB"), which kept the money despite Godoy's repeated written demands for its return.

Godoy brings three claims against each defendant, alleging breach of contract, breach of

fiduciary duty, and malpractice.

There are five pending motions before the Court:  (1) GDB's and Stavis's (collectively, the "GDB defendants") motion to dismiss the Complaint; (2) Godoy's motion asking the Court to consider his sur-reply to the motion to dismiss, which he filed without leave; (3) Godoy's motion for a default judgment against Kartagener; (4) Kartagener's request—not made by a formal motion—that his declaration opposing Godoy's default judgment motion also be construed as a motion to dismiss (or an answer to) the Complaint; and (5) Godoy's motion seeking permission to file an amended (supplemental) opposition to Kartagener's declaration, attaching that opposition.

For the reasons set out below, the Court: (1) denies Godoy's motion for default judgment against Kartagener; (2) grants Kartagener's request to construe his declaration as a motion to dismiss; (3) grants Godoy's motion to file an amended opposition to Kartagener's declaration; (4) grants Godoy's motion to consider his sur-reply; and (5) grants the defendants' motions to dismiss Godoy's claims for breach of fiduciary duty and malpractice, but denies the motions to dismiss Godoy's claims for breach of contract.  The case will now proceed to discovery on those claims.

I.     **Background**

A.     **Facts**[1]

1.     **Godoy's appellate representation**

In 2008, Godoy and co-defendant Monzer Al Kassar were convicted in this District of weapons trafficking charges.  Compl. at 5.  The convictions were "for conspiring to kill U.S.

---

[1] The facts recited herein are drawn from the Complaint.  For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  At the motion to dismiss stage, the Court "may consider 'any written instrument attached to [the Complaint] as an exhibit or any statements or documents incorporated in it by reference.'"  *City*

officers, to acquire and export anti-aircraft missiles, . . . to knowingly provide material support to a terrorist organization[,] . . . [and] to kill U.S. citizens," and for money laundering.  *Al Kassar v. United States*, 660 F.3d 108, 115 (2d Cir. 2011).  Godoy and Al Kassar, and a third defendant, were apprehended after they attempted to sell weapons, including anti-aircraft missiles, to "two undercover [Drug Enforcement Administration ('DEA')] agents posing as members of the FARC (a left-wing Colombian terrorist organization)."  *Id.*; *see id.* at 115–17.  Godoy was sentenced to, *inter alia*, a term of 25 years' imprisonment.  *Id.* at 117.

Godoy and Al Kassar were represented during pretrial proceedings and at the 11-day trial by, respectively, Stavis and Ira Lee Sorkin of the law firm Dickstein Shapiro, LLP ("Dickstein

---

*of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,* 752 F.3d 173, 179 (2d Cir 2014) (quoting *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)) (alteration in original).  The Court considered the various documents that Godoy attached to the Complaint, which consist of two letter agreements, Dkt. 1, Exs. A–B, and correspondence involving the parties relating to Godoy's representation on appeal and the Kartagener retainer, Dkt. 1, Exs. C–Q.  After filing the Complaint, Godoy submitted two affidavits with additional factual allegations.  *See* Dkt. 33 at 13–22 (opposition to GDB defendants' motion to dismiss); Dkt. 34 at 11–15 (opposition to Kartagener declaration).  The GDB defendants objected to the first of these affidavits, including because they contain hearsay and refer to documents not attached to the Complaint as exhibits. Dkt. 31 at 3–4 & n.1.  The Court has reviewed the affidavits.  They are irrelevant to the analysis that follows.

    To provide context on Godoy's underlying criminal case, the Court also takes notice of the district court and Second Circuit docket sheets for that matter, *United States v. Al Kassar*, No. 07 Cr. 354 (JSR) (S.D.N.Y.) ("Criminal Docket"); *United States v. Al Kassar*, No. 09-1051 (2d Cir.) ("Appeal Docket"); and the decision on appeal, 660 F.3d 108 (2d Cir. 2011).  *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (internal quotation marks omitted))); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) ("[D]ocket sheets are public records of which the court could take judicial notice.").

Shapiro").  Compl. at 5; Criminal Docket.[2]  Sorkin and Dickstein Shapiro are not parties to this case.

After their convictions, Godoy and Al Kassar hired Stavis and Sorkin as appellate counsel.  Relevant here, Godoy and Al Kassar signed a "letter of agreement," dated December 9, 2008, on GDB letterhead ("12/9/08 GDB Letter Agreement"), stating that GDB would represent them for a "flat fee of $125,000," which "will cover *all* post-verdict legal services provided in connection with this matter, including, but not limited to: sentencing, appeal of the conviction and sentence to the United States Court of Appeals for the Second Circuit, and petition for writ of certiorari to the United States Supreme Court."  Compl. at 5 (emphasis added); *id.*, Ex. A, at 1. The agreement was signed by Stavis, Godoy, and Al Kassar.  *Id.*, Ex. A, at 1.  Godoy and Al Kassar entered into a similar agreement with Sorkin and Dickstein Shapiro for a separate "flat fee" of $100,000.  *Id.* at 6 & n.1.

Shortly thereafter, Godoy sought out a third attorney to join his appellate team.  He intended this counsel to provide "a fresh set of eyes to work with Stavis and Sorkin on appeal." *Id.* at 6.  At Stavis's recommendation, Godoy and Al Kassar retained Kartagener.  *Id.*  Godoy, Al Kassar, and Kartagener signed a "letter of agreement," dated February 11, 2009 ("2/11/09 Kartagener Letter Agreement").  The agreement provided that Kartagener would be paid "a retainer in the amount of $100,000," which "will cover all post-verdict legal services provided in connection with this matter, including, but not limited to, your appeal of the conviction and sentence to the United States Court of Appeals for the Second Circuit, and petition for writ of

---

[2]  Godoy's Complaint represents that Stavis and Sorkin jointly represented the two defendants at trial and pretrial.  Compl. at 5.  The docket sheet, however, indicates that Stavis represented Godoy and that Sorkin represented Al Kassar.  *See* Criminal Docket, Nos. 19 (Stavis appearance), 36 (Sorkin appearance).  This factual discrepancy is irrelevant to the issues here.

certiorari to the United States Supreme Court." *Id.*, Ex. B, at 1. The agreement stated that "[d]ue to [Godoy's and Al Kassar's] incarceration and present inability to fund this retainer, it is anticipated that the retainer may be paid by a third party or parties." *Id.* The Kartagener retainer was paid immediately by members of Al Kassar's family, acting on behalf of both defendants; but ultimately came from Godoy's money, which Al Kassar's family obtained, with Godoy's permission, by selling assets of Godoy's held in Spain. *Id.* at 6.

About one year later, in January 2010, Godoy learned that Kartagener would be unable to participate in the appeal because he had failed to obtain a security clearance to review classified materials relevant to the case. *Id.* This touched off extended correspondence among Godoy, Al Kassar, Kartagener, and Stavis, regarding the appellate representation and the fate of the $100,000 retainer. This correspondence, largely attached to the pleadings, is reviewed below. From it, Godoy extracts the following points: (1) before February 7, 2010, Kartagener, without Godoy's knowledge or permission, gave the $100,000 retainer he had received to Stavis; (2) Godoy repeatedly demanded that Stavis and Kartagener return to him Kartagener's $100,000 retainer; (3) in letters between February and April 2010, Stavis acknowledged receiving Kartagener's $100,000, refused to return it on the ground that he was applying it to cover extra appellate work he was doing on account, he claimed, of Kartagener's unavailability, and represented that he had received permission to keep it from the third party who had given Kartagener the retainer and from Al Kassar; and (4) notwithstanding the dispute over the retainer, Stavis represented Godoy in his (unsuccessful) appeal. *Id.* at 8–12.

Specifically, the correspondence reflects the following:

*January 29, 2010*:  Stavis sent Godoy a letter ("Stavis's 1/29/10 Letter") regarding Kartagener's inability to serve as Godoy's lawyer.  *Id.* at 6; *id.*, Ex. C.  There, apparently in response to a letter Godoy had sent on January 25, 2010, Stavis wrote:

> If you and [Al Kassar] are agreeable, I will represent both of you on the appeal. . . .
> Of course, if you wish we can find you another appellate attorney, or you can apply
> to the court for one to be appointed.  This is entirely your choice.  When we first
> started talking about appeals we were talking about having me represent the both
> of you and then you decided you wanted someone new. . . .  Anyway, if you write
> me back immediately that you want me to represent you on appeal, I can file a joint
> brief for both you and [Al Kassar] and will do so by the end of February or early
> March at the latest. . . .  Please write quickly to let me know if you want me to
> represent you.

*Id.*, Ex. C.  The letter does not address the fee Godoy would owe Stavis.  *See id.*

*February 7, 2010*:  Godoy sent a letter to Kartagener ("2/7/10 Letter to Kartagener"), cc'ing Al Kassar and Stavis, in which Godoy wrote that because Kartagener would "be unable to fulfill [his] end of the contractual agreement," "I respectfully request that you return my retainer, in full to the third party who sent it to you."  *Id.*, Ex. D; *see id.* at 8.

*February 13, 2010*:  Having not received a response from Kartagener, Godoy sent a letter to Stavis ("2/13/10 Letter to Stavis") addressing Stavis's January 29, 2010 letter.  Godoy's letter addressed both who would represent him in the appeal and the subject of legal fees.  First, Godoy sought to correct Stavis's account of how Kartagener came to be hired.  Rather than 'decid[ing he] wanted someone new,' as Stavis's letter had described, Godoy wrote:

> [W]e signed a contract of agreement on December 9, 2008, where you were to
> represent us as primary counsel on our defense.  On the subsequent month, I
> decided to have additional help and a different opinion of someone that would
> provide with [sic] new ideas. . . .  [U]ltimately I accepted your suggestion to hire
> your friend Mr. Steven Kartagener, on basis you [sic] continue to be primary
> counsel in the defense. . . .  I have always considered you my attorney of record,
> and the others were just for opinion purposes, that could have helped.

*Id.*, Ex. E, at 1.  With respect to the fees, Godoy wrote:

6

> I am concerned about how am I going to terminate my contract with Mr. Kartagener, with the idea of being freed from both parts of the signed [sic] in February 11, 2009, and how he would realize the retainer fund anticipated, because I need to return it to the person that provided it.  Since Mr. Kartagener does not answer to my correspondence, I ask you to please intervene.

*Id.*, Ex. E, at 1–2 (emphasis omitted); *see also id.* at 8.

> *February 23, 2010*:  Stavis responded to Godoy's February 13, 2010 letter, writing:

> You also wrote that you are "concerned" about terminating your contract with Steven Kartagener, particularly the "retainer fund" and the "person who provided it."  Let me assure you that I have consulted with that person and he is very happy and satisfied that I am representing you.  He already knows that Mr. Kartagener has refunded the retainer to me and I am using it to represent you on this appeal.  There is no problem with Mr. Kartagener.  He is off of the appeal and I am the one who is representing you.  You need not worry about this.

*Id.*, Ex. F; *see also id.* at 8–9.  Stavis added that he is "working day and night on [Godoy's] appeal," and that "I always considered you my 'client' even if Steven Kartagener was coming in to work with me on your case."  *Id.*, Ex. F, at 1–2.

> *February 25, 2010*:  Stavis sent a letter to the Second Circuit, containing a Notice of Appearance as substitute counsel for Kartagener, representing Godoy.  *Id.* at 9; *id.*, Ex. G.  Stavis wrote:  "I already represent the lead Defendant-Apelllant [sic], Monzer Al Kassar."  *Id.*, Ex. G.  Godoy alleges, however, that Stavis already represented him, having (on January 10, 2008) filed a notice of appearance in the district court and having never moved to withdraw.  *Id.* at 9.

> *March 22, 2010*:  After Godoy contacted Al Kassar, *id.* at 10, Al Kassar sent a letter to Stavis ("Al Kassar 3/22/10 Letter to Stavis").  As to the $100,000 retainer paid to Kartagener, Al Kassar wrote:

> [Godoy] is not happy or agreeing with the money sent back to you from his X [sic] lawyer, without any permission from him or the people who sent him [sic] or the people who sent the money and he wants to know your fee out of it. . . .   [In my letter from January 28, 2010,] I have told you, "I agree with what ever [sic] [Godoy] agrees."

*Id.*, Ex. H, at 1–2; *see also id.* at 10–11.

*March 30, 2010*:  By letter to both Godoy and Al Kassar ("Stavis's 3/30/10 Letter"),

Stavis responded to Al Kassar's letter and addressed the fee issue at length.  *Id.* at 11; *id.*, Ex. H,

at 2.  Stavis wrote that the flat fee he received was for the "post-verdict sentencing litigation and

[Al Kassar's] appeal," whereas Kartagener "was to receive a fee of $100,000 to represent

[Godoy] on appeal."  *Id.*, Ex. H, at 2.  Stavis wrote that Kartagener was going to write the fact

section of the appellate brief, and stated that, when Kartagener proved unavailable, "you both

agreed that the retainer paid to [Kartagener] would be paid to me as my fee for representing

[Godoy] as well."  *Id.*  Stavis wrote that he had charged his hourly fee of between $450 and $495

for his work to finish the brief and file it by the first week of March.[3]  He added that he would

complete the balance of his work on the appeal, and "the complete fee will be the amount already

paid, which includes the amount refunded to me by Steve Kartagener."  *See id.*, Ex. H, at 2–3.

*April 9, 2010*:  Godoy responded ("4/9/10 Letter to Stavis").  In strong terms, Godoy

disputed that he had consented to Stavis's keeping Kartagener's retainer.  *Id.* at 11.  "I never

agreed to give you the $100,000.00, which was originally paid to Steven R. Kartagener, as a

retainer to represent me."  *Id.*, Ex. I.  Citing his original letter agreement anticipating a $125,000

flat fee for Stavis, Godoy wrote, "If you don't want to keep your original agreement and

represent us both for the $125K, that is fine. I will file my own brief, or ask the court to appoint

me counsel to represent me."  *Id.*

*April 12, 2010 and April 13, 2010*:  Stavis responded with letters sent on April 12, 2010

("Stavis's 4/12/10 Letter") and April 13, 2010 ("Stavis's 4/13/10 Letter").  Stavis's April 12,

---

[3] The appeal brief was filed on behalf of Godoy and Al Kassar on March 8, 2010.  Appeal
Docket.

2010 letter, to Godoy, stated that it was in response to a March 30 letter from Godoy (which the parties have not attached to their pleadings).  Stavis's April 13, 2010 letter, to Godoy and Al Kassar, responded to Godoy's April 9, 2010 letter.  *Id.* at 11.  In both, Stavis wrote that he had not undertaken to replace Kartagener until both Godoy and Al Kassar had agreed, and that *Al Kassar* had agreed that Stavis would receive Kartagener's retainer fee.  *See id.*, Ex. J, at 1; *id.*, Ex. K, at 1.  Stavis wrote that the 12/9/08 GDB Letter Agreement was no longer controlling "because there was a subsequent retainer agreement pursuant to which Steven Kartagener was to be paid $100,000.  Once I took over from him at your specific request, I was entitled to be paid his fee."  *Id.*, Ex. K, at 1.  Stavis added:  "I will not refund the money I was paid to represent you on appeal."  *Id.*  Stavis suggested that Godoy request that the Court of Appeals appoint him counsel immediately.  *Id.*, Ex. K, at 1–2.

*April 26, 2010 and May 10, 2010*:  Godoy responded with two letters to Stavis, one on April 26, 2010, the other on May 10, 2010.  *Id.* at 11–12; *id.*, Ex. L.  In each, Godoy recapped the events leading to Stavis's and Kartagener's hiring, and repeated his demand for the return of Kartagener's retainer fee.  *Id.* at 11–12.  Also on April 26, 2010, Godoy wrote Kartagener, stating that he had not authorized Kartagener to give Stavis the $100,000 retainer fee and demanded its return.  *Id.* at 12; *id.*, Ex. M.  Godoy acknowledges that at that point, "with the appeal already in motion and no money to hire additional Counsel, Godoy was forced to let Stavis solely represent him on appeal."  *Id.* at 12.[4]

---

[4]  On August 9, 2010, Godoy filed a *pro se* supplemental brief.  On December 14, 2010, a reply brief was filed on behalf of both Godoy and Al Kassar.  On February 7, 2011, the Second Circuit held oral argument, at which Stavis appeared on behalf of both Godoy and Al Kassar.  Appeal Docket; *Al Kassar*, 660 F.3d at 114.

### 2.  Outcome of Godoy's appeal and later challenges to his conviction

On September 21, 2011, after oral argument, the Second Circuit affirmed Godoy's and Al Kassar's convictions.  *See generally Al Kassar*, 660 F.3d 108.  The Second Circuit rejected the defendants' claims that the prosecution was aimed solely at extraterritorial conduct, that the defendants' due process rights had been violated, and that there was insufficient evidence.  *See id.* at 117.

On December 21, 2011, Stavis filed a petition for certiorari.  Appeal Docket.  On May 14, 2012, the Supreme Court denied the petition.  *Id.*; *see* 132 S. Ct. 2374 (2012).

Godoy later petitioned for *habeas corpus* relief under 28 U.S.C. § 2255, in which he claimed ineffective assistance of counsel.  Compl. at 12.  In addition to challenging trial counsel's strategy, *see id.* at 12–13, Godoy claimed that Stavis had "violat[ed] his right to attorney of choice by failing to return the $100,000 [retainer] so that he could hire a different attorney," *id.* at 13.

### 3.  Subsequent communications regarding the disputed retainer fee

During the litigation on the § 2255 petition, Stavis exchanged emails with Al Kassar regarding the dispute over the Kartagener retainer.  *See id.* at 13–15; *id.*, Ex. N; *id.*, Ex. O.

On June 9, 2014, Godoy sent GDB a "Formal Request for Reimbursement of Funds," demanding the return of the $100,000 Kartagener retainer within 30 days, and stating that if the money were not returned, he would sue for breach of contract, breach of fiduciary duty, and malpractice.  *Id.* at 16; *id.*, Ex. P.

On June 17, 2014, Stavis emailed Al Kassar, notifying Al Kassar about Godoy's demand and asking Al Kassar to clarify whether the money for Kartagener's retainer had come from Al Kassar's family or Godoy's family.  *Id.* at 16; *id.*, Ex. Q, at 1.

On June 23, 2014, Al Kassar responded by affidavit.  He stated—apparently contrary to Stavis's premise—that the $100,000 retainer for Kartagener had come from the sale of Godoy's assets, which Al Kassar's family undertook at Godoy's request.  *Id.* at 16–17; *id.*, Ex. Q, at 4.

## B.    Procedural History[5]

On August 4, 2014, Godoy filed the Complaint (dated July 30, 2014).  It brought claims of breach of contract, breach of fiduciary duty, and malpractice against Stavis, GDB, and Kartagener.  *Id.* at 18–34.  On September 4, 2014, GDB and Stavis appeared.  Dkt. 2, 4. Kartagener, despite submitting *pro se* correspondence to the Court and despite being a practicing attorney, has yet to file an appearance in the case.

For clarity's sake, the Court presents the ensuing procedural history first as it pertains to Stavis and GDB and then as it pertains to Kartagener.

*GDB and Stavis*:  On October 17, 2014, GDB and Stavis filed a motion to dismiss, Dkt. 11, along with a supporting memorandum of law, Dkt. 12 ("GDB Br."), and a supporting affidavit, Dkt. 16 ("Douglas Aff."), with exhibits attached.  In a submission dated December 18, 2014 and filed on January 30, 2015, Godoy opposed GDB's motion to dismiss, Dkt. 33 ("Godoy Opp. Br."), with an affidavit included.  On January 16, 2015, GDB and Stavis filed a reply in support of their motion to dismiss.  Dkt. 31 ("GDB Reply Br.").  By document dated February 4, 2015 and filed on February 20, 2015, Godoy submitted a sur-reply in opposition to the motion to dismiss.  Dkt. 36 ("Godoy Sur-Reply").  On February 13, 2015, GDB and Stavis filed a letter

---

[5] Because of administrative errors that led to delayed filing of certain of Godoy's submissions, the sequence of filings as reported on the docket does not accurately reflect the sequence and dates of all relevant filings.  The Court's ensuing account of the case's procedural history attempts to reconstruct the actual dates when submissions were made.

objecting to Godoy's sur-reply.  Dkt. 35.  In a submission dated March 17, 2015 and filed on June 19, 2015, Godoy moved for acceptance of his sur-reply.  Dkt. 40.

*Kartagener*:  In a submission dated December 22, 2014 and filed on June 19, 2015, Godoy moved for a default judgment against Kartagener.  Dkt. 41.  On December 31, 2014, Kartagener, acting *pro se*, filed a declaration opposing the motion for default and supporting GDB's motion to dismiss. Dkt. 30 ("Kartagener Decl.").  In a submission dated January 15, 2015 and filed on January 30, 2015, Godoy opposed Kartagener's declaration.  Dkt. 34 ("Godoy Kartagener Opp. Br.").   In a submission served on February 8, 2015 and filed July 7, 2015, Godoy moved to amend his opposition to Kartagener's declaration.  Dkt. 43 ("Godoy Kartagener Am. Opp. Br.").[6]

*Subject Matter Jurisdiction*:  On August 14, 2015, the Court *sua sponte* issued an order giving Godoy an opportunity to file a supplemental submission demonstrating a basis for the Court's exercise of diversity jurisdiction, Dkt. 45.   In a submission dated September 9, 2015 and filed on September 15, 2015, Godoy provided factual allegations regarding his and defendants' citizenship.  Dkt. 46 ("Supp. Compl.").  On September 17, 2015, the Court issued an order directing GDB to respond to Godoy's submission as it pertained to the citizenship of GDB's partners, Dkt. 47.  On September 18, 2015, GDB filed a letter in response.  Dkt. 48 ("GDB Juris. Ltr.").

---

[6] The dates of Godoy's amended opposition to Kartagener's Declaration are elusive.  From their substance and context, this submission was prepared after the initial opposition to Kartagener's declaration.  However, Godoy's amended opposition is dated January 7, 2015, even though it was served by mail on the other parties on February 8, 2015.

## II.      Discussion

### A.      Subject Matter Jurisdiction

"[S]ubject matter jurisdiction is an unwaivable *sine qua non* for the exercise of federal judicial power," *Curley v. Brignoli, Curley & Roberts Assoc.*, 915 F.2d 81, 83 (2d Cir. 1990), and "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action," Fed. R. Civ. P. 12(h)(3).  Godoy claims subject matter jurisdiction based both on the presence of a federal question, *see* 28 U.S.C. § 1331, and on diversity of citizenship, *see* 28 U.S.C. § 1332.  Recognizing that there did not appear to be a basis to claim federal question jurisdiction but that the existence of diversity jurisdiction was unclear, the Court *sua sponte* gave Godoy, *pro se* and incarcerated, "an opportunity to replead the diversity requirements with greater specificity," *Ijemba v. Litchman*, 127 F. App'x 5, 7 (2d Cir. 2005) (summary order); *see also Housand v. Heiman*, 594 F.2d 923, 925–26 (2d Cir. 1979), and thereafter sought clarification from GDB as to the citizenship of its members.

"[D]iversity jurisdiction exists over civil actions (1) between 'citizens of different States' and (2) between 'citizens of a State and citizens or subjects of a foreign state,'" *Herrick Co. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322 (2d Cir. 2001) (quoting 28 U.S.C. § 1332), provided the amount in controversy exceeds the required jurisdictional amount, currently $75,000, 28 U.S.C. § 1332.  Diversity jurisdiction "is available only when all adverse parties to a litigation are completely diverse in their citizenships." *Id.*  When a party is an alien for diversity purposes, "diversity i[s] . . . defeated if another alien party is present on the other side of the litigation." *Franceskin v. Credit Suisse*, 214 F.3d 253, 258 (2d Cir. 2000) (first alteration in original) (quoting *Int'l Shipping Co. v. Hydra Offshore, Inc.*, 875 F.2d 388, 391 (2d Cir. 1989)) (internal quotation mark omitted).

As to Godoy, he alleges that, for purposes of ascertaining whether there is diversity, he is a citizen of Spain.  Supp. Compl. at 2–4.  In support, he notes that he has Spanish citizenship, lived in Spain for the nine years before his extradition to the United States, and has made no effort and has no intention to change his Spanish domicile.  *Id.* at 2–3.  Those allegations suffice. That Godoy is today incarcerated in this country does not alter this result:  In the Second Circuit, "[t]he general rule is that, for diversity purposes, prisoners retain the domicile that they possessed prior to their incarceration," although this presumption is rebuttable.  *LoCurto v. LoCurto*, No. 07 Civ. 8238 (NRB), 2008 WL 4410091, at *5 (S.D.N.Y. Sept. 25, 2008) (citing *Housand*, 594 F.2d at 925 n.5).

As to defendants, Godoy alleges that Stavis and Kartagener are citizens of New York. *See* Supp. Compl. at 5.  As to GDB, "for purposes of establishing diversity, a partnership has the citizenship of each of its partners." *Herrick Co.*, 251 F.3d at 322.  Godoy alleged that GDB's partners are New York citizens—based on the firm's office location—and that no partner "can claim a Spanish domicile."  Supp. Compl. at 5.  Although a partner of GDB need only be an alien to defeat diversity, GDB's response to the Court's September 17, 2015 Order confirmed that "none of the members of [the partnership] are aliens or claim residency in any country other than the United States of America."  GDB Juris. Ltr. at 1.  Therefore, because the amount in controversy based on the disputed retainer exceeds $75,000, this Court has subject matter jurisdiction.

### B.    Godoy's Motion for a Default Judgment Against Kartagener

The Court may grant a default judgment in favor of a plaintiff when a defendant has failed to plead or otherwise defend an action.  *See* Fed. R. Civ. P. 55(a).  "The dispositions of motions for entries of defaults and default judgments . . . are left to the sound discretion of a

district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993). The Second Circuit has repeatedly emphasized its "preference for resolving disputes on the merits," *id.*, and "when doubt exists as to whether default should be granted or vacated, the doubt should be resolved in favor of the defaulting party," *id.* at 96.

In determining whether to grant default judgment, the Court should consider the criteria set out in Federal Rules of Civil Procedure 55(c) and 60(b) and in Second Circuit case law. *See Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 168, 170–71 (2d Cir. 2001). A default may be vacated for "good cause," Fed. R. Civ. P. 55(c), and a party may be relieved from a default judgment for, *inter alia*, "mistake, inadvertence, surprise, or excusable neglect," *id.*; *id.* 60(b). Good cause and the Rule 60(b) criteria "should be construed generously." *Enron Oil*, 10 F.3d at 96. As the Second Circuit instructs, district courts considering default judgments should be "guided by three principal factors: '(1) whether the default was willful, (2) whether the defendant demonstrates the existence of a meritorious defense, and (3) whether, and to what extent, vacating the default will cause the nondefaulting party prejudice.'" *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 166–67 (2d Cir. 2004) (quoting *S.E.C. v. McNulty,* 137 F.3d 732, 738 (2d Cir. 1998)) (addressing motion to vacate under Rule 60(b)); *see also Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir. 1983) (listing same factors for resolving a motion under Rule 55(c)).

Here, on December 22, 2014, Godoy moved for default judgment against Kartagener for "failing to plead, appear, answer, nor [sic] defend" the Complaint. Dkt. 41, at 1. Godoy noted that, as of that time, 109 days had elapsed since Kartagener had signed a waiver of service of the Complaint, well beyond the 60 days to answer for defendants who waive service under Fed. R.

15

Civ. P. 4(d)(3). *Id.* at 2; *see also* Dkt. 3 (waiver of service signed August 29, 2014). Godoy's motion sought a judgment of $500,000 in damages, consistent with his Complaint. Dkt. 41, at 2. Nine days later, Kartagener filed, *pro se*, a declaration opposing the motion. He stated that his failure to answer or otherwise move against the Complaint was based on his lack of familiarity with civil litigation, on a mistaken assumption—based on a discussion with Stavis—that Stavis and GDB would protect his interests in this lawsuit, and the demands of his criminal-defense practice. Kartagener Decl. ¶ 12.

Although Kartagener's disregard of basic litigation formalities (such as filing a notice of appearance and answering a Complaint) is dismaying given his status as an attorney, the Court is persuaded that entry of a default judgment is unwarranted, for two reasons. First, Kartagener has demonstrated a degree of good cause for his failure to defend. Kartagener credibly explains that he made a mistake in assuming that his interests were being represented by Stavis and GDB, who timely defended against Godoy's claims. The Court does not find Kartagener's actions willful, in that there is no basis to believe that he was deliberately avoiding appearing before the Court. *See Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 507 (2d Cir. 1991) (defendant deliberately did not appear to avoid possible indictment in forum state). Indeed, Kartagener acted promptly to oppose Godoy's motion for a default judgment, and did not require a court order for him to do so. *See Pecarsky*, 249 F.3d at 172–73.

Second, for a number of reasons, the interests of justice do not support entry of a default judgment. *See* Fed. R. Civ. P. 60(b)(6). The Court here dismisses two of Godoy's claims. As to the third, for breach of contract, the parties' submissions leave unclear whether Kartagener was or was not authorized to repurpose to Stavis the $100,000 retainer that Godoy had given him. Permitting the case to proceed to discovery and, if warranted, trial, will assure resolution on the

merits of Godoy's claim that the lawyers kept this sum without permission.  And there is no prejudice to Godoy from allowing the case to proceed forward on the merits—there is, for example, no claim that delay occasioned by Kartagener's disregard of this lawsuit resulted in the destruction of relevant evidence.  *Compare Action S.A.*, 951 F.2d at 507–08 (finding prejudice as result of an eight-year delay in proceedings).  Finally, the Court notes, Godoy's default judgment motion seeks $500,000 in damages, five times the value of the allegedly misapplied retainer.  The pleadings and submissions here supply no basis on which such damages could be justified.[7]

For these reasons, and in recognition of the Second Circuit's preference for resolving cases on the merits, the Court exercises its discretion to deny Godoy's motion for a default judgment.

### C.    Kartagener's and Godoy's Additional Requests Regarding Filings

In opposing default judgment, Kartagener asked for an opportunity to answer or move to dismiss the Complaint, and that his declaration be construed as a motion to dismiss.  Kartagener Decl. ¶ 13.  Godoy, for his part, made two submissions (both styled as oppositions) in response.

In the interest of giving these *pro se* parties the opportunity to be heard, the Court grants Kartagener's request that his declaration be construed as a motion to dismiss, and Godoy's motion that the Court accept and consider his oppositions to that declaration.

---

[7] The Complaint seeks $500,000 in compensatory and punitive damages.  Compl. at 35.  Punitive damages are generally unavailable for claims of breach of contract, Godoy's sole surviving claim.  *See Zarour v. Pacific Indem. Co.*, No. 15 Civ. 2663 (JSR), 2015 WL 4385758, at *6 (S.D.N.Y. July 6, 2015) ("[U]nder New York law, punitive damages for breach of contract are available only 'if necessary to vindicate a public right.'" (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 315 (1995))).

### D.   Godoy's Sur-Reply

Godoy also asks the Court to consider his sur-reply, which was filed without leave.  The GDB defendants objected on the grounds that no new evidence or argument was raised in their reply, so as to justify a sur-reply.

The decision to grant a requested sur-reply is left to the "sound discretion of the court." *Anghel v. N.Y. State Dep't of Health*, 947 F. Supp. 2d 284, 293 (E.D.N.Y. 2013) (quoting *De Pedrero v. Schweizer Aircraft Corp.*, 635 F. Supp. 2d 251, 258 (W.D.N.Y. 2009)) (internal quotation mark omitted), *aff'd*, 589 F. App'x 28 (2d Cir. 2015) (summary order), *cert. denied*, 135 S. Ct. 2896 (2015).[8]  The GDB defendants are correct that Godoy could have raised the arguments in his sur-reply in his original opposition brief.  However, the Court, in its discretion, will receive Godoy's sur-reply, out of solicitude for his status as a *pro se* litigant—and in recognition that comparable solicitude is being extended to the *pro se* Kartagener—and to "permit comprehensive adjudication of the issues raised."  *Correspondent Servs. Corp. v. JVW Inv., Ltd.*, No. 99 Civ. 8934 (RWS), 2004 WL 2181087, at *7 (S.D.N.Y. Sept. 29, 2004), *aff'd sub nom. Correspondent Servs. Corp. v. First Equities Corp. of Fla.*, 442 F.3d 767 (2d Cir. 2006) (per curiam).

### E.   The Motions to Dismiss

The Court next addresses the GDB defendants' motion to dismiss, and Kartagener's declaration, which the Court is treating as a motion to dismiss.  Defendants move to dismiss all of Godoy's claims.[9]

---

[8] Federal Rule of Civil Procedure 15(a), on which Godoy relies, is irrelevant, as it applies to a party's pleadings, not briefing in support of those pleadings.

[9] Godoy's claims against GDB are all based on actions taken by Stavis, a GDB partner who is separately named as a defendant.  For the purpose of the motion to dismiss, there is no basis to

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

District courts are "obligated to construe *pro se* complaint[s] liberally," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), interpreting them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). Courts may not, however, "read into *pro se* submissions claims that are not 'consistent' with the *pro se* litigant's allegations, or arguments that the submissions themselves do not 'suggest.'" *Id.* at 477 (citations omitted). *Pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Traguth*, 710 F.2d at 95 (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981)) (internal quotation marks omitted).

---

differentiate between GDB and Stavis, who, on the facts pled, acted at all times as a partner at GDB rather than in a separate capacity.

### 1.    Godoy's breach of contract claim

Under New York law,[10] a breach of contract claim must allege: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.,* 660 F.3d 131, 142 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 177 (2d Cir. 2004)).

### a.    The GDB defendants

Godoy's breach of contract claim against the GDB defendants adequately pleads the required elements.  Godoy alleges that the 12/9/08 GDB Letter Agreement—signed by Godoy, Al Kassar, and Stavis—established that Stavis would represent Godoy in "all" of his appeal for a flat fee of $125,000, Compl. 5, 19–21; *id.*, Ex. A; that Godoy performed by paying that flat fee, *id.* at 5, 21; that Stavis failed to perform by demanding and keeping an additional $100,000 for work he had already contracted to perform, *id.* at 7, 11–12, 21–22; and that the breach damaged Godoy by costing him $100,000 and by impeding Godoy's ability to use that money to choose and hire a different attorney, *id.* at 12–13, 22–23.

In pursuing dismissal, the GDB defendants do not deny that the 12/9/08 GDB Letter Agreement was a valid contract when signed.  But, based on allegations in the Complaint and documents incorporated in it, they argue that Godoy cannot state a claim for breach of that agreement because it was modified, as a matter of law, by express agreement of the parties and by estoppel.  GDB Br. 10, 13.

---

[10] Defendants argue that New York law governs the contract, GDB Br. 10 n.2, and both parties rely on such law in their papers, *see id.*; Compl. at 18; Godoy Opp. Br. 6.  "[I]mplied consent [through the parties' briefs] to use a forum's law is sufficient to establish choice of law." *Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989); *accord Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

"Under New York law, parties may modify a contract 'by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel.'" *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (quoting *CT Chems. (U.S.A.) Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 179 (1993)).   It is "[f]undamental to the establishment of a contract modification [that] proof of each element requisite to the formulation of a contract" be shown. *Id.* (quoting *Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 354 (2d Dep't 1980) (first alteration in original)).   Decisive here, this requires mutual assent to the modified terms. *Id.*

To prove a modification of an attorney-client agreement, "the burden is on the attorney to establish that the client acquiesced in the agreement 'with full knowledge of all the material circumstances known to the attorney,' and that such acquiescence was not brought about by fraud on the attorney's part, or misconception on the part of the client." *King v. Fox*, 7 N.Y.3d 181, 190 (2006) (quoting *Greene v. Greene*, 56 N.Y.2d 86, 92 (1982)); *see also Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 838 (2d Cir. 1993).   New York courts view an attorney's claim of a midstream modification to a fee agreement with particular scrutiny.   *See Naiman v. N.Y. Univ. Hosps. Ctr.*, 351 F. Supp. 2d 257, 263 (S.D.N.Y. 2005); *Baye v. Grindlinger*, 78 A.D.2d 690, 690 (2d Dep't 1980) ("The rule is well established that as to contracts between an attorney and his client subsequent to employment which are beneficial to the attorney, it is incumbent on the attorney to show that the terms are fair and reasonable and fully known and understood by the client."); *In re Howell,* 215 N.Y. 466, 472 (1915) (attorney-client agreements modified during course of representation will be "carefully scrutinized").

The GDB defendants argue that there were two modifications to the 12/9/10 GDB Letter Agreement.   But as to neither alleged modification do the facts alleged in the Complaint and

other cognizable materials unambiguously demonstrate a modification of the agreement, agreed to by Godoy, under which Stavis was permitted to keep the $100,000 once earmarked for Kartagener.

The first modification, the GDB defendants argue, occurred when Kartagener was retained in February 2009, two months after Stavis's retention. But the materials cognizable at this stage reveal two different perspectives on the impact of that retention on Stavis's appellate duties. The GDB defendants contend that Kartagener was be in a "lead role on the appeal." GDB Br. 11 (citing Compl., Ex. H). Godoy counters that Kartagener was "'only' retained to provide fresh ideas and opinions," and that his retention did not relieve Stavis of contractual responsibility as the lead attorney responsible for the appeal. Godoy Opp. Br. 5; *see also* Compl. at 6 (alleging that Godoy "decided that he wanted an [additional] third attorney with a fresh set of eyes to work with Stavis and Sorkin on appeal") (brackets in original); *id.*, Ex. E ("I decided to have additional help and a different opinion of someone that would provide with new ideas."). Supporting Godoy's claim is that the 12/9/10 GDB Letter Agreement was not—based on the pleadings and cognizable correspondence—modified in writing when Kartagener was retained. And the 12/9/10 Letter Agreement had not limited in scope the appellate work for which Stavis was being retained. Nor did it provide that a separate attorney would be responsible for a subset of Godoy's appellate work. Instead, the agreement committed Stavis to handle, without limitation, "*all* post-verdict legal services." *Id.*, Ex. A (emphasis added).

The Court cannot, on the pleadings, choose among the parties' differing factual claims as to concretely what they expected—at the point Kartagener was hired—Stavis's appellate duties

to be.[11]  But even if on the pleadings the GDB defendants' claim could be accepted that all concerned expected Kartagener to play a role on the appeal that would serve to reduce Stavis's work, this would not mean that Stavis's contract with Godoy had been modified.  Merely because Godoy understood that Kartagener would play an active role on his appeal does not mean that Godoy assented to the transfer of the contract's $100,000 retainer to a different lawyer in the event Kartagener were incapacitated.  It certainly does not dictate that Godoy consented to paying *Stavis* an additional $100,000 for taking on Kartagener's work.  On the contrary, Godoy could reasonably have expected Stavis—who as trial counsel was familiar with the record below, and who had committed to handle "all" of Godoy's appellate work for $125,000—to charge materially less for work on the appeal than Kartagener, who would have needed to learn the record below from scratch.

The GBD defendants argue that a second modification occurred after Kartagener failed to obtain security clearance and was terminated as appellate counsel.  They argue that Godoy agreed to allow Stavis to take over Kartagener's work, and that the parties' communications "indisputably demonstrate" that Godoy agreed that Stavis would keep Kartagener's retainer.  GDB Br. 12 (citing Compl., Ex. C; *id.*, Ex. E).

The documents on which the GDB defendants rely do not support this claim at all.  Godoy does not dispute that he agreed that Stavis would represent him on the appeal, *see* Compl. at 12, as the 12/9/08 GDB Letter Agreement already committed Stavis to do.  But on the disputed point—whether Godoy agreed that Stavis would keep Kartagener's retainer once Kartagener dropped away—the cognizable documents reflect no such agreement.  Stavis's

---

[11] The letters by which Stavis and Kartagener were retained do not specify each attorney's role, and instead describe the appellate assignment in substantially identical terms.  *See* Compl., Ex. A; *id.*, Ex. B.

January 29, 2010 Letter to Godoy, for example, states that Kartagener's hiring altered the arrangement between Stavis and Godoy, but it does not mention fees, *id.*, Ex. C, and Godoy's February 13, 2010 response reflects Godoy's strong *disagreement* that Stavis's obligations under the original agreement had been revised, *id.*, Ex. E. Godoy further stated his intention to recoup Kartagener's $100,000 retainer, "because I need to return it to the person that provided it." *Id.* And his ensuing letters emphatically reflect Godoy's lack of consent to Stavis's bid to keep the $100,000.

Far from demonstrating mutual assent to a modification, these letters, if anything, suggest that Stavis and Godoy did not have a meeting of the minds as to the fate of that $100,000. Of course, the evidence adduced in discovery may yet prove such agreement. Such evidence may show, for example, that Godoy elsewhere agreed, or delegated to a third party the authority to consent to Stavis's retention of the additional $100,000 in consideration for additional work, or that the $100,000 belonged to Al Kassar and was not Godoy's to control. But on the present motion to dismiss, Godoy's claim not to have consented to Stavis's taking an additional $100,000 is, at a bare minimum, plausible.

The GDB defendants alternatively argue that Godoy is estopped from claiming a breach of contract because he, ostensibly, induced Stavis to take on additional work by promising Stavis that he could keep Kartagener's retainer. *See* GDB Br. 12–13. But the parties' communications do not establish any such commitment by Godoy. And the cases on which the GDB defendants rely are inapplicable. Under New York General Obligations Law § 15–301, in general, "a written agreement that expressly states it can be modified only in writing cannot be modified orally." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990). The equitable estoppel cases on which the GDB defendants rely limit the reach of § 15–301

24

insofar as they bar a party that has "induced another's significant and substantial reliance upon

an oral modification" from relying on the statute to preclude proof of the oral modification. *Club*

*Haven Inv. Co., LLC, v. Capital Co. of Am., LLC*, 160 F. Supp. 2d 590, 592 (S.D.N.Y. 2001)

(quoting *Rose v. Spa Realty Assoc.*, 42 N.Y.2d 338, 344–45 (1977)).  But the 12/9/08 GDB

Letter Agreement does not prohibit oral modification.  And Godoy is not invoking § 15–301 to

prevent GDB defendants from arguing that an oral modification occurred.  He asserts, instead,

factually, that it simply did not occur.  Equitable estoppel does not preclude Godoy from

factually contesting that the modification claimed by defendants—whether written or oral—took

place.

     In a second argument based on estoppel, the GDB defendants argue that they relied to

their detriment on Godoy's hiring of a third lawyer, Kartagener, in that this led them to divide up

appellate responsibilities with him.  GDB Br. 12–13; GDB Reply Br. 4–5.  And, they argue, they

then relied on Godoy's "encourage[ment]" to continue work on the appeal after Kartagener

dropped out, and did "an immense of [sic] amount of work in a short period of time," in the

expectation that Stavis could keep Kartagener's fees.  GDB Br. 13; *see also* GDB Reply Br. 5.

     The cognizable facts, however, do not compel the finding of such an estoppel.  "[A]

claim for equitable estoppel 'rests upon the word or deed of one party upon which another

rightfully relies and so relying changes his position to his injury.'"  *Gaia House Mezz LLC v.*

*State St. Bank & Trust Co.*, 720 F.3d 84, 90 (2d Cir. 2013) (quoting *Nassau Trust Co. v.*

*Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982)).  Godoy disputes that Stavis could

rightly rely on their communications, or on the addition and later subtraction of Kartagener from

the appellate team, as a basis to keep Kartagener's $100,000.  *See* Godoy Opp. Br. 6; Godoy

Sur-Reply 3.  And Godoy's letters to Stavis are consistent with this position.

Whether Stavis could lawfully keep Kartagener's retainer in reliance on the facts known to him is, ultimately, a factual question that cannot be resolved on the pleadings.  Among the facts that may be relevant to such a defense of estoppel are (1) the role the parties anticipated Kartagener to play on the appeal;[12] (2) the extent to which Kartagener's fee was understood to reflect "ramp-up" time familiarizing himself with the case; (3) whether Godoy, in fact, "encouraged" Stavis to take on "Kartagener's work," as opposed to insisting that Stavis handle the entire appeal consistent with the original retainer agreement; and (4) any oral communications (or as-yet unproduced written communications) between Godoy (or his agents) and GDB relevant to the terms under which Stavis would take on "Kartagener's work."  Notably, estoppel was found in the cases on which the GDB defendants rely not on the pleadings, but later, at summary judgment.  *See* GDB Reply Br. 5 (citing *Towers Charter*, 894 F.2d at 522; *S. Fed. Sav. & Loan Ass'n of Georgia v. 21-26 E. 105th St. Assoc.*, 145 B.R. 375, 381 (S.D.N.Y. 1991), *aff'd,* 978 F.2d 706 (2d Cir. 1992) (table decision)).

The Court, accordingly, denies the GDB defendants' motion to dismiss Godoy's claims for breach of contract based on Stavis's retention of Kartagener's $100,000 retainer.  The GDB defendants, of course, remain free—at summary judgment or at trial—to contest liability on this claim, including under their theories of modification or estoppel, if the facts support such

---

[12] The GDB defendants' assertions that Stavis took on "Kartagener's work," *see, e.g.*, GDB Br. 12, might have different implications depending on whether, for example, Godoy understood that Kartagener would share the workload with Stavis and Sorkin in drafting the brief, or whether Kartagener's tasks were more limited—such as consulting on legal issues or reviewing draft briefs or participating in a pre-argument moot court—such that they would not tend to lessen Stavis's pre-existing workload.

defenses, or to raise other defenses or claims of entitlement to fees beyond the $125,000 flat fee set out in the original letter agreement.

### b.   Kartagener

Godoy also has pled all elements of a breach of contract claim against Kartagener.  First, he alleges that there was a contract—between him, Al Kassar, and Kartagener, under which Kartagener would be paid a flat fee of $100,000, paid for by retainer, in exchange for his work on Godoy and Al Kassar's sentencing and appeal.  Compl. at 6, 23–24; *id.*, Ex. B.  Second, he alleges that he performed by paying Kartagener the retainer from his funds, which were accessed by Al Kassar's family.  *Id.* at 6, 24.  Third, he alleges that Kartagener failed to perform, in that, he did not—and could not—represent Godoy or Al Kassar on appeal.  *Id.* at 7, 24.  Fourth, Godoy alleges that he incurred $100,000 in damages as a result of Kartagener's breach, in that Kartagener, once realizing that he could not take on the appeal, was contractually obliged to return the $100,000 retainer, instead of giving it to Stavis.  *Id.* at 8, 24–25.

Kartagener makes various factual rejoinders.  He represents that Godoy and Al Kassar hired him to join their appellate defense team, Kartagener Decl. ¶ 7; that he understood Stavis to be Al Kassar's lead attorney and that Stavis told him that his retainer would be paid by Al Kassar's family, *id.* ¶ 6; that he understood the $100,000 check he received to come from Al Kassar's family, *id.* ¶ 7; that when he failed to obtain security clearance, Stavis told him to give him (Stavis) the $100,000 *id.* ¶ 8; that he sent Stavis the $100,000, *id.* ¶ 9; and that he believed there was "nothing wrong" with doing so because he understood the money to be Al Kassar's, and therefore he was simply returning the money to Al Kassar's representative, *id.* ¶ 8.

On a motion to dismiss, however, the Court cannot assume these factual claims to be true, and significant aspects of Kartagener's narrative—including that the $100,000 paid to him

belonged not to Godoy, but to Al Kassar—are disputed.  The Court must instead draw all reasonable inferences in favor of Godoy.  Kartagener is entitled to attempt to develop the facts favorable to him in discovery, and the facts may substantiate a legally cognizable defense.  The Court notes, however, that to the extent Kartagener may come to defend against this claim by asserting that he repurposed the $100,000 to Stavis in the good-faith but mistaken belief that the $100,000 did not belong to Godoy—perhaps in reliance on representations or directions from Stavis—due attention will need to be given whether subjective good-faith is a defense to a breach of contract.

Kartagener's motion to dismiss the breach of contract claim is, therefore, denied.

### 2.  Godoy's breach of fiduciary duty claim

"In New York, '[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand.'"  *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 196 (S.D.N.Y. 2011) (quoting *Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, No. 07 Civ. 376 (JMB), 2008 WL 2275902, at *3 (S.D.N.Y. June 3, 2008) (internal quotation marks omitted).  "Instead, a plaintiff must 'set[ ] forth allegations that, *apart from the terms of the contract,* the parties created a relationship of higher trust than would arise from [their contracts] alone so as to permit a cause of action for breach of a fiduciary duty independent of the contractual duties.'"  *Id.* (alterations and emphasis in original) (quoting *Brooks v. Key Trust Co. Nat. Ass'n,* 26 A.D.3d 628, 630 (3d Dep't 2006)).  In other words, "[a] breach of fiduciary duty claim is duplicative when it is based on allegations of fiduciary wrongdoing that are expressly raised in plaintiff's breach of contract claim."  *Northern Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 105 (S.D.N.Y. 2013) (citations and alterations omitted).

### a.    The GDB defendants

Godoy alleges that the GDB defendants breached their fiduciary duty to him by keeping, in exchange for work on the appeal, the $100,000 Kartagener retainer, in addition to the flat fee of $125,000 originally agreed to.  Compl. at 26–27, 30.  The GDB defendants argue that this claim impermissibly duplicates Godoy's breach of contract claim.  They are correct.

Godoy's fiduciary duty claim arises from the same facts underlying the breach of contract claim.  Godoy alleges that Stavis had a fiduciary duty "as his attorney and *per contract*," *id.* at 26 (emphasis added); that the breach of duty consisted of Stavis's helping himself to more than the flat fee agreed to under the contract; and that his damages consisted of his overpaying by $100,000 for GDB's services.  These claims track Godoy's contract claim.  *See id.* at 26–27; Godoy Sur-Reply 4–5.  Therefore, whether or not Stavis's and GDB's duties to Godoy with respect to the $100,000 sounded in contract alone or also in fiduciary duty, any breach of fiduciary duty claim against Stavis and GDB with respect to that sum must be dismissed.

### b.    Kartagener

Godoy alleges that Kartagener breached his fiduciary duty because Kartagener had a fiduciary duty as Godoy's attorney and per their contract; that Kartagener breached that duty by transferring to another (Stavis) the contractual retainer without Godoy's consent; and that Godoy was damaged thereby by the loss of $100,000.  Compl. at 30–31.  As with the GDB defendants, this claim is duplicative of, and subsumed by, Godoy's contract claim against Kartagener.   The Court therefore dismisses Godoy's claim for breach of fiduciary duty against Kartagener.

### 3.    Godoy's malpractice claim

To establish legal malpractice, a plaintiff must establish: "(1) attorney negligence; (2) which is the proximate cause of a loss; and (3) actual damages."  *Nordwind v. Rowland*, 584 F.3d

420, 429 (2d Cir. 2009) (emphasis omitted) (quoting *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006)).  To show such negligence, "a plaintiff must allege that the attorney's conduct 'fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of the profession.'" *Capogrosso v. Lecrichia*, No. 07 Civ. 2722 (BSJ), 2010 WL 2076962, at *5 (S.D.N.Y. May 24, 2010) (quoting *Achtman*, 464 F.3d at 337).  To show proximate cause, a "plaintiff must establish that but for the attorney's negligence, plaintiff would have prevailed in the matter in question or would not have sustained any ascertainable damages." *Schwartz v. Olshan Grundman Frome & Rosenzweig*, 302 A.D.2d 193, 198 (1st Dep't 2003).  However, "[t]he standard for a criminal defense malpractice claim differs from the standard for general legal malpractice." *Sash v. Schwartz*, No. 04 Civ. 9634 (DC), 2007 WL 30042, at *7 (S.D.N.Y. Jan. 4 2007), *aff'd*, 365 F. App'x 555 (2d Cir. 2009) (summary order). "Under New York law, '[t]o state a cause of action for legal malpractice arising from negligent representation in a criminal proceeding, plaintiff must allege his innocence or a colorable claim of innocence of the underlying offense, for so long as the determination of his guilt of that offense remains undisturbed, no cause of action will lie.'" *Abuhouran v. Lans*, 269 F. App'x 134, 135 (2d Cir. 2008) (summary order) (alteration in original) (quoting *Carmel v. Lunney*, 70 N.Y.2d 169, 173 (1987)).

### a.      The GDB defendants

Godoy alleges that Stavis and GDB committed malpractice because they "denied Godoy of his Sixth Amendment right to effective assistance [of counsel] during both the trial and direct appeal proceedings."  Compl. at 31.  Explaining this claim, Godoy's Complaint incorporated by reference six claims he made in pursuing relief in the petition he earlier brought under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence.  *See id.* at 32 (relying on 13 Civ. 2383, Dkt. 1

("§ 2255 Br.")).  Specifically, Godoy claimed ineffective assistance of counsel on five grounds:
for failing to move for severance from Al Kassar; for failing to move to exclude certain
evidence; for failing to call an expert witness; for violating his right to his attorney of choice as a
result of GDB's retention of the Kartagener retainer; for failing to make separate and distinct
arguments for Godoy in the jury charges and on appeal; and for violating his Sixth Amendment
right to conflict-free counsel based on Stavis's joint representation of Godoy and Al Kassar on
appeal.

Though Godoy's § 2255 petition was pending at the time he filed his Complaint in this
case, it was later dismissed.  On March 20, 2014, Judge Gorenstein issued a Report and
Recommendation recommending that the petition be dismissed; and on August 3, 2014, Judge
Rakoff adopted the Report and Recommendation.  No. 13 Civ. 2383 (JSR) (S.D.N.Y. Aug. 3,
2014); Douglas Aff., Ex. 2 ("§ 2255 Decision") at 3, 69; GDB Br. 17.[13]

Godoy's malpractice claims against GDB defendants must therefore be dismissed.  First,
he cannot plausibly, and does not, allege his innocence in the underlying criminal case in which
he claims malpractice.  "[F]or so long as the determination of his guilt of that offense remains
undisturbed, no cause of action will lie." *Abuhouran*, 269 F. App'x at 135 (quoting *Carmel,* 70
N.Y.2d at 173) (internal quotation mark omitted).

Second, collateral estoppel bars Godoy's malpractice claims because the issues on which
he claims malpractice were litigated and decided on his § 2255 petition.  "Collateral estoppel, or
issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue

---

[13] As noted *supra* note 1, the Court may take judicial notice of such public records and filings in
deciding a motion to dismiss under Rule 12(b)(6).  *See Kramer v. Time Warner Inc.*, 937 F.2d
767, 773 (2d Cir. 1991); *cf. Giannone v. York Tape & Label, Inc.*, No. 06 Civ. 6575 (JFB)
(AKT), 2007 WL 1521500, at *1 (E.D.N.Y. May 23, 2007) (discussing use of court documents
for related doctrine of *res judicata*), *aff'd*, 548 F.3d 191 (2d Cir. 2008) (per curiam).

of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002). "Collateral estoppel applies when: '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.' *Id.* at 288–89 (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).

These requirements are met here. First, the issues Godoy raises now are the same in the § 2255 petition, as reflected in Godoy's reliance on his memorandum of law in the earlier case to articulate his theories of malpractice. *See Kowalczyk v. Gilroy*, 994 F. Supp. 410, 412 (E.D.N.Y. 1998) (finding collateral estoppel barred legal malpractice claim due to prior *habeas corpus* action alleging ineffective assistance), *aff'd*, 166 F.3d 1200 (2d Cir. 1998) (summary order); *see also Purdy v. Zeldes*, 337 F.3d 253, 258–60 (2d Cir. 2003) (upholding collateral estoppel bar of malpractice claim due to prior *habeas corpus* action alleging ineffective assistance, noting that ineffective assistance inquiry under *Strickland v. Washington*, 466 U.S. 668 (1984), "mirror[s]" that for malpractice under Vermont law, which requires attorney negligence and proximate cause of harm). Second, Godoy's claims of malpractice were all litigated and resolved in Judge Gorenstein's Report and Recommendation, which Judge Rakoff adopted in full. § 2255 Decision at 3, 68; *see also id.* at 24–43, 49–62. Third, Godoy had a full and fair opportunity in the § 2255 proceeding to litigate these issues. He filed a 171-page memorandum of law in support of his petition, a further reply brief, and objections to the Report and Recommendation.

§2255 Br.; *see* 13 Civ. 2383, Dkt. 11, 19.  Fourth, and finally, the court's decision on each issue was necessary to support a final determination on the merits.

Godoy's claims for malpractice are therefore dismissed as against Stavis and GDB.

### b.    Kartagener

Godoy alleges that Kartagener committed malpractice, first, by not representing him in his criminal appeal as promised, which Godoy claims "very likely cost him his appeal," and second, by releasing the $100,000 retainer to Stavis without Godoy's or Al Kassar's consent, which Godoy claims cost him $100,000.  Compl. at 34.

Godoy's malpractice claim must be dismissed as to both alleged acts of malpractice. First, to the extent Godoy claims malpractice in the form of Kartagener's non-participation in Godoy's criminal appeal, this claim, like that against the GDB defendants, fails, because "so long as the determination of his guilt of that offense remains undisturbed, no cause of action will lie." *Abuhouran*, 269 F. App'x at 135 (quoting *Carmel*, 70 N.Y.2d at 173) (internal quotation mark omitted).

Second, to the extent that Godoy challenges Kartagener's non-return of the $100,000 retainer, Godoy fails to state a malpractice claim, and the claim he does make duplicates his contract claim.  Godoy argues that Kartagener's failure to return the $100,000 after Kartagener failed to receive security clearance violated New York Rule of Professional Conduct 1.16(e), which requires the prompt refund of unearned fees paid in advance.  Godoy Kartagener Am. Opp. Br. 5–6.  But, "[t]o the extent that plaintiff seeks to allege malpractice based on a violation of the New York Rules of Professional Conduct, such an alleged violation does not, without more, support a malpractice claim."  *Cohen v. Kachroo*, 115 A.D.3d 512, 513 (1st Dep't 2014).

And this alleged lapse by Kartagener on which Godoy bases this malpractice claim wholly duplicates his contract claim. In both claims, he alleges that there was a contract for the provision of services, that Godoy paid for those services, and that Kartagener did not return Godoy's money while not providing the services for which Godoy contracted. The Court therefore dismisses the malpractice claim. *Cf. Between The Bread Realty Corp. v. Salans Hertzfeld Heilbronn Christy & Viener*, 290 A.D.2d 380, 380 (1st Dep't 2002) (dismissing claims for breach of contract as "merely redundant pleadings" of the malpractice claims because they were "based upon defendants' purported failure to exercise due care and to abide by professional standards").

## CONCLUSION

For the foregoing reasons, the Court denies Godoy's motion for default judgment against Kartagener; grants defendants' motions to dismiss Godoy's claims for breach of fiduciary duty and malpractice; but denies defendants' motions to dismiss Godoy's claims for breach of contract. The Clerk of Court is directed to close the motions pending at docket 11, 40, 41, and 43. An order will follow shortly as to next steps in this case.[14]

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 30, 2015
    New York, New York

---

[14] Embedded in Godoy's papers are 'motions' for discovery of certain materials. *See* Dkt. 1-6, at 24–26; Compl. at 29; Godoy Opp. Br. 1, 9–10; Godoy Kartagener Opp. Br. 4–6. Those motions, for the time being, are denied, without prejudice to Godoy's right to pursue such discovery once the period for discovery begins.