UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
LUIS FELIPE MORENO-GODOY,                                         :
                                                                  :     14 Civ. 7082 (PAE)
                                    Plaintiff,                    :
                                                                  :     OPINION & ORDER
               -v-                                                :
                                                                  :
GALLET DREYER & BERKEY, LLP, ROGER L.                             :
STAVIS, ESQ., and STEVEN R. KARTAGENER, ESQ.,                     :
                                                                  :
                                    Defendants.                   :
                                                                  :
------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

    This case, now before the Court on a motion for summary judgment, involves claims by a convicted defendant asserting that his appellate counsel in his criminal appeal misapplied $100,000 of a retainer fee.

    On August 4, 2014, plaintiff Luis Felipe Moreno-Godoy, proceeding *pro se*, filed a civil complaint, Dkt. 1 (the "Complaint" or "Compl."), bringing claims against both the counsel that represented him, and a lawyer who attempted unsuccessfully to represent him, in his criminal appeals. His core claim is that he paid a $100,000 retainer to Steven R. Kartagener, Esq., (the "Kartagener retainer") to join his existing appellate team, but that, when Kartagener determined that he could not represent Moreno-Godoy, due to a failure to obtain a security clearance, Kartagener did not return the retainer. Rather, Moreno-Godoy alleges that, without his consent, Kartagener paid the $100,000 to another of Godoy's appellate attorneys, Roger L. Stavis, Esq., of the law firm Gallet Dreyer & Berkey, LLP ("GDB"), which kept the money despite Moreno-Godoy's repeated written demands for its return. In its ruling on motions to dismiss by GDB and

Stavis, the Court left standing Moreno-Godoy's claims for breach of contract against Stavis, GDB, and Kartagener, and his quasi-contractual claims for unjust enrichment, money had and received, and constructive trust against Stavis and GDB.

There are three pending summary judgment motions: (1) defendants' motions as to all of Moreno-Godoy's contractual and quasi-contractual claims; (2) Moreno-Godoy's motion as to all of his remaining claims; and (3) Kartagener's claim for summary judgment on his cross-claim against GDB.

For the reasons below, the Court: (1) denies GDB and Kartagener's motions for summary judgment on Moreno-Godoy's claims; (2) grants Stavis's motion for summary judgment on such claims; (3) denies Moreno-Godoy's motion for summary judgment on his claims; and (4) denies Kartagener's motion for summary judgment on his cross-claim against GDB.

## I. Background

### A. Facts[1]

In 2008, Moreno-Godoy and co-defendant Monzer Al Kassar were convicted in this District of weapons trafficking charges. JSUF ¶ 1. The convictions were "for conspiring to kill U.S. officers, to acquire and export anti-aircraft missiles . . . to knowingly provide material

---

[1] The Court draws the following facts from the parties' submissions on their cross-motions, including their Joint Stipulation of Undisputed Facts, Dkt. 109 ("JSUF"), and, where appropriate, exhibits attached to these submissions. The Court also takes notice of the district court and Second Circuit docket sheets for Moreno-Godoy's underlying case, *United States v. Al Kassar*, No. 07 Cr. 354 (JSR) (S.D.N.Y.) ("Criminal Docket"); *United States v. Al Kassar*, No. 09-1051 (2d Cir.) ("Appeal Docket"); and decision on appeal, 660 F.3d 108 (2d Cir. 2011). *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (internal quotation marks omitted))); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) ("[D]ocket sheets are public records of which the court could take judicial notice.").

support to a terrorist organization . . . [and] to kill U.S. citizens," and for money laundering. *Al Kassar v. United States*, 660 F.3d 108, 115 (2d Cir. 2011). Moreno-Godoy and Al Kassar, and a third defendant, were apprehended after they attempted to sell weapons, including anti-aircraft missiles, to "two undercover [Drug Enforcement Administration ('DEA')] agents posing as members of the FARC (a left-wing Colombian terrorist organization)." *Id.*; *see id.* at 115–17. Moreno-Godoy was sentenced to, *inter alia*, a term of 25 years' imprisonment. *Id.* at 117.

Moreno-Godoy and Al Kassar were represented during pretrial proceedings and at the 11-day trial by, respectively, Stavis, and Ira Lee Sorkin of the law firm Dickstein Shapiro, LLP ("Dickstein Shapiro"). JSUF ¶¶ 4, 14. Sorkin and Dickstein Shapiro are not parties to this case.

After their convictions, Moreno-Godoy and Al Kassar hired Stavis and Sorkin as their respective appellate counsel. *Id.* ¶¶ 8–15. Relevant here, Moreno-Godoy and Al Kassar signed a "letter of agreement," dated December 9, 2008, on GDB letterhead ("12/9/08 GDB Letter Agreement"), stating that GDB would represent them for a "flat fee of $125,000," which "will cover all post-verdict legal services provided in connection with this matter, including, but not limited to: sentencing, appeal of the conviction and sentence to the United States Court of Appeals for the Second Circuit, and petition for writ of certiorari to the United States Supreme Court." Complaint at 5; *id.*, Ex. A, at 1; JSUF ¶¶ 9–12. The agreement was signed by Stavis, Moreno-Godoy, and Al Kassar. *Id.* Moreno-Godoy and Al Kassar entered into a similar agreement with Sorkin and Dickstein Shapiro for a separate "flat fee" of $100,000. *Id.* ¶ 14.

Shortly thereafter, Moreno-Godoy sought out a third attorney to join his appellate team. He intended this counsel to provide a fresh set of eyes to work on the appeal; at Stavis's recommendation, Moreno-Godoy and Al Kassar retained Kartagener. *Id.* ¶ 16. Moreno-Godoy, Al Kassar, and Kartagener signed a "letter of agreement," dated February 11, 2009 ("2/11/09

Kartagener Letter Agreement"), stating that Kartagener would be paid a flat fee of $100,000 to "represent both Plaintiff and Al Kassar in all post-verdict legal proceedings." JSUF ¶ 18; *see also* Complaint, Ex. B, at 1. On February 18, 2009, in accordance with the terms of that agreement, Al Kassar's wife, Raghdaa Habbal, transferred $100,000 from Bank Audi, located in Beirut, Lebanon, to Kartagener. JSUF ¶¶ 18–20.

About one year later, in January 2010, Moreno-Godoy learned that Kartagener would be unable to participate in the appeal because he had failed to obtain a security clearance to review classified materials relevant to the case. *Id.* ¶ 29. This touched off extended correspondence among Moreno-Godoy, Al Kassar, Kartagener, and Stavis, regarding the appellate representation and the fate of the $100,000 retainer. *Id.* ¶¶ 30–43.

On January 29, 2010, Stavis wrote a letter to Moreno-Godoy, stating, "I thought it preferable for me to be your lawyer because I know the case; already have a security clearance; and can file the brief quickly so you don't lose any more time. Of course, if you wish we can find you another appellate attorney, or you can apply to the court for one to be appointed. This is entirely your choice. When we first started talking about the appeal we were talking about having me represent the both of you and then you decided you wanted someone new." *Id.* ¶ 30. Stavis also wrote that "If you and Monzer are agreeable I will represent both of you on the appeal." *Id.* ¶ 31. Stavis urged Moreno-Godoy to "write quickly to let me know if you want me to represent you." *Id.*

On February 4, 2010, Stavis again wrote to Moreno-Godoy stating, "I spoke to Monzer this morning and he is pleased that I am willing to represent you." *Id.* ¶ 35.

On February 7, 2010, Moreno-Godoy wrote to Kartagener, cc'ing Stavis and Al Kassar. He stated that, under the terms of the February 11, 2009 retainer letter, Kartagener had already

4

agreed to represent him in the Second Circuit and, if necessary, in the United States Supreme Court and that, in exchange, Moreno-Godoy asserted that, "I agreed to have a $100[,]000 retainer deposited with your firm by a third party which I did." *Id.* ¶ 36. Moreno-Godoy further stated that, because Kartagener had not been able to obtain the necessary security clearance, "I respectfully request that you return my retainer, in full to the third party who sent it to you. . . . If for any reason(s) you disagree with my request, I ask that you state your reason(s) in writing." *Id.*

On February 13, 2010, Moreno-Godoy replied in writing to Stavis's January 29, 2010 letter. In that letter, he quoted Stavis's earlier statement that "[w]hen we first started talking about the appeal we were talking about having me represent the both of you and then you decided you wanted someone new." *Id.* ¶ 38. He also stated that "I would like to correct you in this" and that, "I believe[] that there is an error, because we signed a contract of agreement on December 9, 2008, where you were to represent us as primary counsel on our defense. On the subsequent month, I decided to have additional help and a different opinion of someone that would provide with new ideas. I gave you names of different attorneys to hire, but ultimately, I accepted your suggestion to hire your friend Mr. Steven Kartagener on basis you continue to be primary counsel in the defense." *Id.* Moreno-Godoy's letter also stated that "I am confused and saddened, that you state in your letter, 'if you wish, we can find another appellate attorney or you can apply in the court so that one may be appointed'; when I have always considered you my attorney of record and the others were just for opinion purposes, that could have helped," *id.* ¶ 39. The letter asked for Stavis's help in getting Kartagener to return the retainer to the third party who had sent it, because Kartagener was not responding to Moreno-Godoy himself. *Id.* ¶ 40.

5

On February 23, 2017, Stavis wrote to Moreno-Godoy, referencing Moreno-Godoy's concern that the retainer be returned to "the 'person who provided it'" and stating, "I have consulted with that person and he is very happy and satisfied that I am representing you. He already knows that Mr. Kartagener has refunded the retainer to me and I am using it to represent you on this appeal." *Id.* ¶ 41. In that letter, Stavis added that he was "committed to moving quickly so that no more time is lost," *id.* ¶ 42, and that he "always considered you my 'client' even if Steven Kartagener was coming in to work with me on your case," *id.* ¶ 43.

On February 25, 2010, Stavis filed a Notice of Appearance as "substitute counsel" for Moreno-Godoy. *Id.* ¶ 44.

On September 21, 2011, after argument, the Second Circuit affirmed Moreno-Godoy's and Al Kassar's convictions. *See generally*, *Al Kassar*, 660 F.3d 108. The Circuit rejected the defendants' arguments that their conduct had been wholly extraterritorial, that the defendants' due process rights had been violated, and that there was insufficient evidence. *See id.* at 117.

On December 21, 2011, Stavis filed a petition for certiorari. Appeal Docket. On May 14, 2012, the Supreme Court denied the petition. *Id.*; *see* 132 S. Ct. 2374 (2012).

Moreno-Godoy later petitioned for *habeas corpus* relief under 28 U.S.C. § 2255, claiming ineffective assistance of counsel. JSUF ¶¶ 73–74. During litigation on the § 2255 petition, Stavis exchanged emails with Al Kassar regarding the dispute over the Kartagener retainer. *Id.* ¶¶ 75–76.

On or about June 17, 2014, Stavis emailed Al Kassar, notifying Al Kassar about Moreno-Godoy's commencement of this lawsuit, and asking Al Kassar to clarify whether the money for Kartagener's retainer had come from Al Kassar's family or Moreno-Godoy's family. *Id.* ¶ 77. On or about that same day, Al Kassar replied to Stavis's email, informing Stavis that the Bureau

6

of Prisons had cut off contact between himself and Moreno-Godoy, and stating that "[i]n reply to your question, to be very honest and clear, when Felipe left Marbella to go to Romania prior to his arrest, he had some valuable personal properties, car and some money which belong to him. He asked my family to sell all of his belonging[]s and to send $100,000 to cover the fees of the lawyer Steven Kartagener." *Id.* ¶ 78.

At no time did Stavis visit Moreno-Godoy in prison, or conduct any telephone or other oral conversation with Moreno-Godoy regarding the appeal or the $100,000 retainer fee that had been provided to Kartagener. *Id.* ¶ 79. The entirety of the communications directly between Stavis and Moreno-Godoy regarding these matters was by letter. *Id.*

### B. Procedural History

On August 4, 2014, Moreno-Godoy filed the original Complaint (dated July 30, 2014). It brought claims of breach of contract, breach of fiduciary duty, and malpractice against Stavis, GDB, and Kartagener. Complaint ¶¶ 18–34. On October 17, 2014, GDB and Stavis filed a motion to dismiss. Dkt. 11. In a submission dated December 22, 2014 and filed on June 19, 2015, Moreno-Godoy moved for a default judgment against Kartagener. Dkt. 41.

On August 14, 2015, the Court *sua sponte* issued an order giving Moreno-Godoy an opportunity to file a supplemental submission demonstrating a basis for the Court's exercise of diversity jurisdiction. Dkt. 45. In a submission dated September 9, 2015 and filed on September 15, 2015, Moreno-Godoy provided factual allegations regarding his and defendants' citizenship. Dkt. 46. On September 17, 2015, the Court issued an order directing GDB to respond to Moreno-Godoy's submission as it pertained to the citizenship of GDB's partners. Dkt. 47. On September 18, 2015, GDB filed a letter in response. Dkt. 48.

7

On September 30, 2015, the Court issued a decision, denying Moreno-Godoy's motion for default judgment against Kartagener, and granting defendants' motion to dismiss Moreno-Godoy's Moreno-Godoy's claims for breach of contract. Dkt. 49.

On October 20, 2015, GDB and Stavis answered the Complaint. Dkt. 56. On October 23, 2015, Kartagener, now represented by counsel, answered the Complaint, and brought a cross-claim against GDB for indemnification. Dkt. 59. On November 2, 2015, the Court appointed *pro bono* counsel to represent Moreno-Godoy. Dkt. 62. On November 6, 2015, GDB answered Kartagener's cross-claim. Dkt. 63.

On October 14, 2016, Moreno-Godoy filed an Amended Complaint, adding quasi-contractual claims for unjust enrichment, money had and received, and constructive trust against GDB and Stavis. Dkt. 96 ("Am. Compl."). On October 28, 2016, GDB and Stavis answered the Amended Complaint. Dkt. 97. On November 1, 2016, Kartagener answered the Amended Complaint, again bringing a cross-claim for indemnification against GDB. Dkt. 99. The same day, GDB answered Kartagener's cross-claim. Dkt. 100.

On March 17, 2017, GDB and Stavis filed a motion for summary judgment against Moreno-Godoy's claims, Dkt. 114, with an affidavit, Dkt. 115, and memorandum of law, Dkt. 116 ("GDB/Stavis Br."), in support. Kartagener joined this motion. Dkt. 117. On April 11, 2017, Moreno-Godoy filed a memorandum of law in opposition to GDB and Stavis's motion. Dkt. 121 ("Pl. Opp. Br."). On April 14, 2017, Moreno-Godoy filed a motion for summary judgment on all of his claims, Dkt. 122, along with a declaration, Dkt. 123, and a memorandum of law, Dkt. 124 ("Pl. Br."), in support. On April 27, 2017, GDB and Stavis filed a reply memorandum, Dkt. 126 ("GDB/Stavis Rep. Br."), along with an additional affidavit, Dkt. 125, in support of their motion for summary judgment. Also on April 27, 2017, Kartagener filed a

declaration, Dkt. 127, and a memorandum of law, Dkt. 128 ("Kartagener Br."), in support of his joint motion with GDB and Stavis for summary judgment on Moreno-Godoy's claims, and in support of his motion for summary judgment as to his cross-claim against GDB and Stavis for indemnification. On April 28, 2017, Kartagener filed a reply memorandum of law in support of all of his motions. Dkt. 129 ("Kartagener Rep. Br."). On May 12, 2017, Moreno-Godoy filed a reply memorandum of law in support of his motion. Dkt. 130 ("Pl. Rep. Br.").

## II. Legal Standards Applicable to Summary Judgment Motions

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

9

## III. Discussion

The parties' cross-motions for summary judgment with regard to Moreno-Godoy's claims for breach of contract, unjust enrichment, money had and received, and constructive trust center on this issue: Can Moreno-Godoy prove the element of damages—essential to each claim—by showing that it was he, rather than Al Kassar or Al Kassar's family, who owned the $100,000 which Al Kassar's wife transferred to Kartagener for Moreno-Godoy's appellate representation, and which was later given by Kartagener to Stavis and GDB. Moreno-Godoy argues that it is not necessary for him to show that he owned these funds to prove damages, and, alternatively, that he has done so, and indeed, done so beyond any genuine question of fact. Conversely, defendants argue that proof of Moreno-Godoy's ownership of the funds is necessary for his claims to proceed, and that summary judgment in their favor is required because there is not competent evidence on which a reasonable juror could find that the $100,000, in fact, was Moreno-Godoy's.

The ensuing analysis proceeds as follows. First, the Court holds, it is essential to Moreno-Godoy's claims that he demonstrate ownership of the $100,000 that was allegedly misapplied, and there is a genuine issue of fact as to whether he did, in fact, own those funds. Therefore, both sides' motions for summary judgment based on this element must be denied. Second, the Court holds, Stavis (although not the partnership to which he belongs, GDB) is entitled to summary judgment on Moreno-Godoy's claim against him, because he is exempt from liability based on New York partnership law. Third, the Court denies Kartagener's motion for summary judgment on his cross-claim for indemnification against GDB, because principles of equity and fairness do not compel granting that motion at this time.

### A. The Cross Motions for Summary Judgment Based on the Damages Element

In his motion, Moreno-Godoy argues that he is entitled to summary judgment on his claim for breach of contract against defendants, or alternatively on his quasi-contract claims, because a reasonable jury could find only his favor on all elements of those claims, including damages. In opposing that motion and in cross-moving for summary judgment in their favor, defendants, without conceding the other elements, counter that Moreno-Godoy cannot prove damages because he has not adduced admissible evidence that he owned the $100,000 in dispute.

A threshold issue is therefore whether, as defendants contend, Moreno-Godoy is required to show his ownership of the $100,000 that he claims was misapplied. Damages are a required element of both the contract and quasi-contract causes of action.

Under New York law, to establish breach of contract claim, a plaintiff must show: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)); *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach."). Thus, "[t]he failure to prove damages is . . . fatal to [a] plaintiff's breach of contract cause of action." *LNC Investments, Inc. v. First Fid. Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999) (internal quotation marks and citations omitted).

The same is true of Moreno-Godoy's quasi-contract claims. To establish unjust enrichment under New York law, a plaintiff must prove that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,

631 F.3d 42, 55 (2d Cir. 2011). To prove a claim for "money had" under New York law, a plaintiff must prove, *inter alia*, that the "defendant received money *belonging to plaintiff*." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984) (emphasis added). And to prevail on a claim for constructive trust, under New York law, a plaintiff must first prove the elements of unjust enrichment. *See In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) ("New York law generally requires four elements for a constructive trust: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust enrichment") (internal citations omitted); *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 354 (2d Cir. 1992) (unjust enrichment constitutes the "key factor" in determining whether a constructive trust should be imposed).

In the context of this case, proving damages on these claims require Moreno-Godoy to prove ownership of the $100,000, such that its misapplication damaged him. Moreno-Godoy does not articulate any alternative theory of damages. He does not allege, for example, deficient legal representation on appeal (nor is there evidence of the same). Therefore, to prove the damages element on each of his surviving claims, Moreno-Godoy must prove that the $100,000 belonged to him—as opposed to, say, Al Kassar or Al Kassar's family.

In so holding, the Court finds inapposite the 1932 Appellate Division case on which Moreno-Godoy relies for his argument that, on the breach of contract claim, he can prevail even if the misapplied $100,000 belonged to someone else. In *Coleman v. Dorsen*, 234 A.D. 255, 256, 254 N.Y.S. 771, 772 (App. Div. 1932), the court held that it was "sufficient to sustain a cause of action for breach of contract" where defendants failed to pay the plaintiffs money ($5,878) under a contract where the consideration for that payment was the performance of a

service by a third party. *Coleman*'s holding was that there was valid consideration for plaintiffs' claim, entitling plaintiff to sue for performance. But consideration and performance are not at issue here. Rather, the issue is, assuming that a breach of contract is found, whether Moreno-Godoy—who seeks for himself $100,000 in damages—can validly claim damages. If the money for the legal representation belonged to someone else such that Moreno-Godoy had no claim to it, he, unlike the plaintiffs in *Coleman*, cannot prevail.

The Court therefore turns to the evidence on this point, which Moreno-Godoy argues conclusively proves that the $100,000 was, in fact, his money, and which defendants argue is legally insufficient to so establish. There are three items of such evidence:

First, Moreno-Godoy relies on his own deposition testimony. He testified that he had worked for Al Kassar's company, Alkaport, for many years, and that his earnings had been held for him as savings in a company account rather than taken out as salary. Moreno-Godoy Dep. at 14. He also testified that he left various personal property in the possession of the Al Kassar family, including two luxury automobiles, an expensive watch collection, and several jet skis, *id.* at 21, and that he asked that this property be sold to fund his and Al Kassar's defense, *id.* at 41. Moreno-Godoy testified that he had told Al Kassar, "that I wanted to help pay for the new vision, you know, the additional defense with my belongings. I felt that was due." *Id.* And, he testified, he had told Al Kassar "that I had a moral obligation . . . to help out with this because the Al Kassars had already paid some $2 million." *Id.* Moreno-Godoy testified that he learned only "much later that it was [Al Kassar's] wife" who had paid directly paid Kartagener's legal fees. *Id.* at 42. Moreno-Godoy could not, however, give any detail as to what property of his had been sold to fund his representation by Kartagener. *Id.* at 44–45. Nor did he come forward with any documentation of such a sale.

13

This testimony is, by itself, insufficient to establish Moreno-Godoy's ownership of the $100,000. Simply put, Moreno-Godoy did not participate in the process by which the $100,000 was paid. Even crediting his claim to have directed that his funds be used for the purpose of paying for the appellate representation, there is no foundation for his speculation that the money on which Al Kassar's wife drew to pay Kartagener in fact derived from undistributed salary, or sales of personal possessions, of Moreno-Godoy. Moreno-Godoy was in federal prison at the time of this payment, and does not claim to have been proximate to Al-Kassar's wife. Were there no other evidence on this element, Moreno-Godoy therefore would be unable to establish it, and defendants would be entailed to summary judgment in their favor. *See Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (summary order) (plaintiffs' evidence held insufficient to defeat summary judgment when it consisted solely of self-serving testimony unsupported by admissible evidence).

Second, Moreno-Godoy relies on Al Kassar's deposition testimony. Al Kassar attested that Moreno-Godoy had told him: "I want to pay this money. I have two cars . . . and I have a property I will ask you to be in touch with my family to sell these cars," Al Kassar Dep. at 47. Al Kassar also testified that "definitely they [his family] sold [Moreno-Godoy's] property" and send $100,000 in proceeds to Mr. Kartagener from Beirut, "as far as I know from the account of my wife as far as I can remember." *Id.*

This testimony, too, is incompetent to establish Moreno-Godoy's ownership of the $100,000. The Court assumes, *arguendo*, that Al Kassar's statement about Moreno-Godoy's earlier statements to him as to his intentions—that Moreno-Godoy had "wanted" to pay the money for Kartagener's representation—would be admissible, perhaps under Fed. R. Evid. 801(d)(1)(B)(i), to rebut defendants' claim that Moreno-Godoy's claim in this lawsuit of

14

ownership of the $100,000 is a recent fabrication. But that statement says nothing about where in fact the $1000,000 derived from—and Al Kassar is, like Moreno-Godoy, incompetent to testify as to that point, having also been in prison at the time that the appellate retainer was paid. For that reason, Al Kassar's assertion that Moreno-Godoy "definitely . . . sold this property" is inadmissible hearsay, to the extent offered to prove the truth of the matter asserted, as its only foundation, according to Al Kassar, is "from the account of my wife as far as I can remember." Al Kassar Dep. at 47. Al Kassar's testimony therefore, while corroborating Moreno-Godoy's claim that he had wanted personally to supply the $100,000, does not establish that his money in fact did so.

Third, Moreno-Godoy offers a declaration by Al Kassar's wife, Raghdaa Habbal, who, undisputedly, paid the $100,000 to Kartagener out of her personal account. *See* JSUF ¶ 19–20. She attests that "Mr. Moreno was . . . owner of a car . . . which was sold upon his request and the price was collected by [Alkaport] on his behalf and kept as savings for him," and that "[t]he total amount of savings of Mr. Moreno were equivalent to [$100,000] that were remitted upon his instructions on the 18th of February, 2009 to his attorney MR. STEVEN R. KARTAGENER." Dkt. 123, Ex. 4 ("Habbal Decl.").

In contrast to the testimony of Moreno-Godoy and Al Kassar, Habbal's declaration is from a percipient witness to the payment of the $100,000. To be sure, defendants fairly note that there are sound bases to question Habbal's credibility on this point, including on grounds of bias. Her claim to have acted at Moreno-Godoy's behest is also arguably in tension with, though not irreconcilably inconsistent with, Moreno-Godoy's statement that he learned of the sale of his property by Ms. Habbal only after the fact. In the end, however, it is the Court's duty on a motion for summary judgment to view the facts "in the light most favorable" to Moreno-Godoy,

15

the non-moving party in this instance. *Celotex Corp.* 477 U.S. at 323. Viewed most favorably to Moreno-Godoy, Habbal's assertion that the $100,000 that she personally sent to Kartagener derived from Moreno-Godoy's savings and from the sale of his property, assuming she testifies to this effect at trial and is credited by the trier of fact, would provide a basis on which to find that the $100,000 belonged to Moreno-Godoy.

The Court, therefore, cannot grant defendants' motion for summary judgment based on the premise that Moreno-Godoy cannot establish the element of damages. However, Moreno-Godoy's motion for summary judgment must also be denied. There is no assurance that Habbal will be credited on these points. Cross-examination could, for example, lead the trier of fact to disbelieve this version of events, which appears to lack any documentary corroboration. The Court therefore denies both parties' motions for summary judgment to the extent based on the element of damages. There is a genuine issue of material fact as to that point.

### B. Stavis's Motion for Summary Judgment

Stavis moves for summary judgment in his favor on Moreno-Godoy's claims against him on a separate ground: that he is statutorily immune from liability because, in requesting and accepting the $100,000, he was acting in his capacity as a GDB partner, not in an individual capacity.

Under New York Partnership Law § 26(b):

> Except as provided by subdivisions (c) and (d) of this section, no partner of a partnership which is a registered limited liability partnership is liable or accountable, directly or indirectly (including by way of indemnification, contribution or otherwise), for any debts, obligations or liabilities of, or chargeable to, the registered limited liability partnership or each other, whether arising in tort, contract or otherwise, which are incurred, created or assumed by such partnership while such partnership is a registered limited liability partnership, solely by reason of being such a partner or acting (or omitting to act) in such capacity or rendering professional services or otherwise participating (as an employee, consultant, contractor or otherwise) in the conduct of the other business or activities of the registered limited liability partnership.

It is undisputed that at all relevant times, GDB was a registered limited liability partnership, and Stavis was a partner of GDB. JSUF ¶ 5. It is also undisputed that Stavis acted, including in his representation of Moreno-Godoy and as a signatory of the retainer letter, as a partner of GDB, rather than in his personal capacity. *Id.* ¶ 11. Finally, it is also undisputed that the $100,000 provided to Kartagener by Al Kassar's wife, and ultimately transferred to GDB, was paid into GDB operating accounts for disposal, rather than to Stavis personally. *Id.* ¶ 33, 68. It follows that under § 26(b), Stavis cannot be liable to any debt that GDB might be held here to owe to Moreno-Godoy.

Moreno-Godoy argues that Stavis can be found liable under the exception to § 26(b) provided in § 26(c) for a "negligent or wrongful act or misconduct" committed by a general partner. The Court's review of the evidence, to the very limited extent Moreno-Godoy marshals it on this point, does not persuade the Court, however, that, on the unusual fact pattern presented, there is sufficient evidence of any such professional "misconduct" to trigger this exception. If Moreno-Godoy prevails before the finder of fact on his claims sounding in contract and/or quasi-contract, his remedy will therefore be against GDB, and not Stavis individually.

The Court therefore grants summary judgment to Stavis on Moreno-Godoy's claims against him in his individual capacity.

### C. Kartagener's Summary Judgment Motions

Apart from his summary judgment motion based on the element of damages, which the Court has denied, Kartagener pursues summary judgment on Moreno-Godoy's claims against him on two other grounds. First, he argues, this relief is warranted because he returned the $100,000 to GDB rather than personally keeping it. Second, he argues, to the extent claims

17

against him are based on his breach of his retainer contract with Moreno-Godoy, his performance under that contract was made impossible when he was denied a security clearance.

In support of the first theory, Kartagener relies on the proposition that "[l]awyers are agents for their clients." *Chevron Corp. v. Salazar*, 275 F.R.D. 422, 426 (S.D.N.Y. 2011) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962)). He argues that, because the undisputed immediate source of the $100,000 was Al Kassar's wife, and because he returned the funds to Stavis, who, as Al Kassar's attorney, was also Al Kassar's agent, he (Kartagener) necessarily complied with Moreno-Godoy's instructions to return the funds to the "third party who sent it to you." JSUF ¶ 36.

That argument does not necessitate judgment in Kartagener's favor. As Moreno-Godoy points out, in forwarding the money to Stavis and GDB, it appears that Kartagener made no "effort to ascertain whether Stavis's request was consistent with the wishes of either client, nor whether Stavis in fact returned the money to Al Kassar." Pl. Rep. Br. at 8. Viewing the facts in the light most favorable to Moreno-Godoy, under which Moreno-Godoy owned the funds that Al Kassar's wife sent to Kartagener, a finder of fact could conclude that it had not been consonant with the wishes of the owner of those funds for Kartagener to lateral them to Stavis and GDB who proceeded to keep them, to Moreno-Godoy's detriment. Whether Kartagener is liable to Moreno-Godoy is properly left for trial.

Kartagener alternatively notes that once he failed to obtain a security clearance, his performance under the contract—namely, his legal representation of Moreno-Godoy—became impossible. *See* Kartagener Rep. Br. at 8. But that is beside the point. Moreno-Godoy does not claim injury from the fact that Kartagener did not represent him on appeal, but from the fact that the defendants did not return the $100,000 that Moreno-Godoy (allegedly) had paid for the

18

appellate representation. Moreover, even if the impossibility of performance prevented Moreno-Godoy from pursuing the breach of contract claim against Kartagener, Moreno-Godoy's quasi-contract claims separately seek the same relief (return of the $100,000).

Finally, Kartagener pursues summary judgment on his cross-claim against GDB for indemnification. He argues that "based upon the law's notion of what is fair and proper as between the parties," *Mas v. Two Bridges Associates*, 75 N.Y.2d 680, 690 (1990), he is entitled to be indemnified by GDB for any portion of the $100,000 that me might owe to Moreno-Godoy, given that GDB—and not he—kept that money. Kartagener Br. at 7–8.

The Court denies that motion. To be sure, Kartagener's argument that, if all defendants are found liable, GDB—and not he—should be required to reimburse Moreno-Godoy for the mishandled $100,000 because GDB kept that money would appear to have considerable force. But this equitable relief is best assessed when all the facts are fully known to the Court. The doctrine reflected in *Mas* aims to correct inequities when "there is 'a great difference' in the gravity of the fault of the two tort-feasors, or because the duties owed to the injured plaintiffs and causing injury are disproportionate." 75 N.Y. 2d at 690. Such considerations, the Court there noted, are "hardly precise," *id.* at 691. Pending a verdict and the Court's acquisition of a full perspective on the facts, the Court is unprepared to conclusively rule—at this juncture—that in any scenario in which Kartagener and GDB are both found liable, the *Mas* doctrine will require full indemnification of Kartagener by GDB.

The Court therefore denies Kartagener's motion for summary judgment as to his cross-claim for indemnity against GDB.

19

## CONCLUSION

For the foregoing reasons, the Court denies all summary judgment motions, save Stavis's motion—in his individual capacity—for summary judgment against Moreno-Godoy. The Clerk of Court is directed to close the motions pending at docket numbers 105, 114, 117, and 122.

An order will follow shortly as to next steps in this case.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: June 29, 2017
       New York, New York