USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/11/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LUIS FELIPE MORENO-GODOY,

                              Plaintiff,

        -v-

GALLET DREYER & BERKEY, LLP, and STEVEN R.
KARTAGENER, ESQ.,

                              Defendants.

14 Civ. 7082 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case, now before the Court on combined motions *in limine* and for summary

judgment, involves breach of contract and related claims by a convicted defendant asserting that

counsel in his criminal appeal misapplied $100,000 of a retainer fee belonging to the defendant.

On August 4, 2014, plaintiff Luis Felipe Moreno-Godoy, proceeding *pro se*, filed a civil

complaint, Dkt. 1 ("Compl."), bringing claims against both the counsel that represented him, and

an attorney who attempted unsuccessfully to represent him, in his criminal appeal. His core

claim is that he and his co-defendant/co-appellant paid a $100,000 retainer to defendant Steven

R. Kartagener, Esq., to join their existing appellate team, but that, after Kartagener determined

that he could not represent them due to a failure to obtain a necessary security clearance,

Kartagener did not return the retainer. Instead, Moreno-Godoy alleges, Kartagener furnished the

$100,000 to another of Moreno-Godoy's appellate attorneys, Roger L. Stavis, Esq., of the law

firm Gallet Dreyer & Berkey, LLP ("GDB"), without Moreno-Godoy's consent.[1] Moreno-

---

[1] Stavis was named as a co-defendant in this action in his individual capacity, but all claims
against him have been dismissed. Dkt. 131. The sole defendants are Kartagener and GDB.

Godoy further alleges that defendant GDB kept the money despite his written demands that it be returned.

A central issue is whether the $100,000, which was paid to Kartagener not by Moreno-Godoy but by the overseas wife of his co-defendant and co-appellant, belonged to Moreno-Godoy, so as to enable him to sue for misapplication of the money. Currently pending are defendants' (1) motions *in limine*, arguing that non-party witness Raghdaa Habbal is precluded from testifying that Moreno-Godoy in fact owned the disputed $100,000; and (2) motions for summary judgment, arguing that, if Habbal's statements regarding the ownership of the $100,000 are excluded as inadmissible, Moreno-Godoy's remaining claims must be dismissed because there is no competent evidence that Moreno-Godoy owed that sum. For the reasons that follow, the Court grants defendants' motions *in limine* and motions for summary judgment and dismisses Moreno-Godoy's remaining claims.

## I. Background[2]

### A. Factual Background

The Court assumes familiarity with the facts of this case, which are recounted in detail in the Court's September 30, 2015 Opinion & Order, *see* Dkt. 49, *Moreno-Godoy v. Gallet Dreyer*

---

[2] The Court draws the following facts from the parties' submissions on defendants' motions, including GDB's memorandum of law in support of its motion *in limine* and motion for summary judgment, Dkt. 179 ("GDB Mem."); the September 18, 2018 affidavit of Adam M. Felsenstein in support of GDB's motion, Dkt. 178 ("September 2018 Felsenstein Aff."), and attached exhibits; Kartagener's memorandum of law in support of his motion *in limine* and motion for summary judgment, Dkt. 181 ("Kartagener Mem."); Moreno-Godoy's memorandum in opposition to these motions, Dkt. 182 ("Moreno-Godoy Mem."), and the attached exhibits; and the March 29, 2019 affidavit of Adam M. Felsenstein, Dkt. 187 ("March 2019 Felsenstein Aff."), and attached exhibits. The Court also takes notice of the District Court and Second Circuit docket sheets for Moreno-Godoy's underlying cases, *United States v. Al Kassar*, No. 07 Cr. 354 (JSR) (S.D.N.Y.); *United States v. Al Kassar*, No. 09-1051 (2d Cir.); and decision on appeal, 660 F.3d 108 (2d Cir. 2011). *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

*& Berkey, LLP*, 2015 WL 5737565 (S.D.N.Y. Sept. 30, 2015) ("*Moreno-Godoy I*"), and its June 29, 2017 Opinion & Order, *see* Dkt. 131, *Moreno-Godoy v. Gallet Dreyer & Berkey, LLP*, 2017 WL 2829815 (S.D.N.Y. June 29, 2017) ("*Moreno-Godoy II*"). The Court sets out here only those facts relevant to the instant dispute.

In 2008, Moreno-Godoy and co-defendant Monzer Al Kassar were convicted in this District of weapons trafficking charges. *See Moreno-Godoy II*, 2017 WL 2829815, at *2. After their convictions, Moreno-Godoy and Al Kassar hired Stavis and non-party Ira Lee Sorkin, Esq., of the law firm Dickstein Shapiro, LLP. *Id.* Moreno-Godoy and Al Kassar signed a "letter of agreement" dated December 9, 2008, on GDB letterhead, stating that GDB would represent them for a "flat fee of $125,000," which "will cover all post-verdict legal services provided in connection with this matter, including, but not limited to: sentencing, appeal of the conviction and sentence to the United States Court of Appeals for the Second Circuit, and petition for writ of certiorari to the United States Supreme Court." *Id.* The agreement was signed by Stavis, Moreno-Godoy, and Al Kassar. *Id.* Shortly thereafter, Moreno-Godoy and Al Kassar retained Kartagener to join their appellate team. *Id.* Moreno-Godoy, Al Kassar, and Kartagener signed a "letter of agreement," dated February 11, 2009, stating that Kartagener would be paid a flat fee of $100,000 to "represent both Plaintiff and Al Kassar in all post-verdict legal proceedings." *Id.* On February 18, 2009, Al Kassar's wife, Raghdaa Habbal, transferred $100,000 from Bank Audi, located in Beirut, Lebanon, to Kartagener on Moreno-Godoy's behalf. *Id.*

In January 2010, Moreno-Godoy learned that Kartagener would not be able to participate in the appeal because he had failed to obtain a security clearance to review classified material relevant to the case. *Id.* Moreno-Godoy, Al Kassar, Kartagener, and Stavis engaged in extended communications regarding the appellate representation and the $100,000 retainer. *Id.* The Court

has previously reviewed this correspondence in detail. *See id.* at *2–3. As relevant here, on February 7, 2010, Moreno-Godoy wrote to Kartagener, copying Stavis and Al Kassar, stating that under the terms of the February 11, 2009 retainer letter, Kartagener had already agreed to represent him on appeal, and, in exchange, Moreno-Godoy had agreed to deposit, and had deposited, a $100,000 retainer with GDB. *Id.* at *3. Moreno-Godoy further stated that because Kartagener had been unable to obtain the necessary security clearance, "I respectfully request that you return my retainer, in full to the third party who sent it to you. . . . If for any reason(s) you disagree with my request, I ask that you state your reason(s) in writing." *Id.*

On February 23, 2017, Stavis wrote to Moreno-Godoy, referencing Moreno-Godoy's request that the retainer be returned to "the 'person who provided it'" and stating, "I have consulted with the person and he is very happy and satisfied that I am representing you. He already knows that Mr. Kartagener has refunded the retainer to me and I am using it to represent you on this appeal." *Id.*

On September 21, 2011, the Second Circuit affirmed Moreno-Godoy's and Al Kassar's convictions. On December 21, 2011, Stavis filed a petition for certiorari. On May 14, 2012, the Supreme Court denied the petition. *See* 566 U.S. 986 (2012).

**B.      History of this Litigation**

On August 4, 2014, Moreno-Godoy, then *pro se*, filed the original Complaint, asserting claims of breach of contract, breach of fiduciary duty, and malpractice against Stavis, GDB, and Kartagener. Dkt. 1 ("Compl.") ¶¶ 18–34. Al Kassar did not then—or at any later point—join this lawsuit.

On October 17, 2014, GDB and Stavis filed a motion to dismiss. Dkt. 11. In a submission dated December 22, 2014, and filed on June 19, 2015, Moreno-Godoy moved for a

default judgment against Kartagener. Dkt. 41. On September 30, 2015, the Court issued an opinion denying Moreno-Godoy's motion for default judgment against Kartagener, granting defendants' motion to dismiss Moreno-Godoy's claims for breach of fiduciary duty and malpractice, and denying defendants' motion to dismiss Moreno-Godoy's claims for breach of contract. Dkt. 49.

On October 20, 2015, GDB and Stavis answered the Complaint. Dkt. 56. On October 23, 2015, Kartagener, now represented by counsel, answered the Complaint and brought a cross-claim against GDB for indemnification. Dkt. 59. On November 2, 2015, the Court appointed *pro bono* counsel to represent Moreno-Godoy. Dkt. 62. On November 6, 2015, GDB answered Kartagener's cross-claim. Dkt. 63.

On October 14, 2016, Moreno-Godoy filed an Amended Complaint, adding quasi-contractual claims for unjust enrichment, money had and received, and constructive trust against GDB and Stavis. Dkt. 96 ("Am. Compl."). On October 28, 2016, GDB and Stavis answered the Amended Complaint. Dkt. 97. On November 1, 2016, Kartagener answered the Amended Complaint, again bringing a cross-claim for indemnification against GDB. Dkt. 99. The same day, GDB answered Kartagener's cross-claim. Dkt. 100.

On March 17, 2017, GDB and Stavis filed a motion for summary judgment on Moreno-Godoy's claims. Dkt. 114. Kartagener joined this motion. Dkt. 117. On April 14, 2017, Moreno-Godoy filed a motion for summary judgment on all of his claims. Dkt. 122. On June 29, 2017, the Court denied all summary judgment motions, save Stavis's in his individual capacity, for summary judgment against Moreno-Godoy. *See generally Moreno-Godoy II*, 2017 WL 2829815. The Court denied summary judgment to Moreno-Godoy because there was an issue of fact as to whether the $100,000 paid to Kartagener had belonged to Moreno-Godoy, as

opposed to co-appellant Al Kassar or his family. Relevant here, the Court held that, to prevail on any of his claims, Moreno-Godoy must prove that he in fact owned the disputed $100,000. On the issue of ownership, the Court explained that the deposition testimony of Moreno-Godoy and Al Kassar was insufficient to establish Moreno-Godoy's ownership of the funds because neither had been a percipient witness to the $100,000 transfer. *Id.* at *7–8.

However, the Court noted, Moreno-Godoy had also submitted a declaration from Al Kassar's wife, Raghdaa Habbal, the person who undisputedly paid the $100,000 to Kartagener from her personal account. *Id.* at *8. She stated in the declaration that the $100,000 she transferred was owned by Moreno-Godoy. *Id.* The Court agreed that Habbal was a percipient witness to the transfer of the $100,000. If she testified at trial, based on her personal knowledge, that the $100,000 belonged to Moreno-Godoy, the Court held, her testimony "would provide a basis on which to find that the $100,000 belonged to Moreno-Godoy." *Id.* However, the Court held, summary judgment could not be granted to Moreno-Godoy on his claims because the finder of fact was not obliged to credit Habbal's testimony as to Moreno-Godoy's ownership. *Id.*

On July 13, 2017, Moreno-Godoy moved for reconsideration of that Order. Dkt. 132. On July 21, 2017, GDB and Kartagener cross-moved for reconsideration of the portion of the Court's Order denying their summary judgment claims and opposed Moreno-Godoy's motion for reconsideration. Dkt. 134, 136. On July 28, 2017, the Court denied all three motions for reconsideration. Dkt. 139.

On August 21, 2017, Moreno-Godoy filed a letter seeking leave for Habbal, who lives in Spain, to testify at trial, not in person, but either by a pretrial *de bene esse* deposition or by live video-link. Dkt. 142. The Court authorized the taking of Habbal's videotaped deposition in Spain and ordered that the deposition be completed by January 31, 2018. Dkt. 163. This

deadline was later extended to February 2, 2018. Dkt. 169. Habbal's deposition testimony, discussed in detail below, was centrally expected to cover, *inter alia*, whether the $100,000 at issue had belonged to Moreno-Godoy, or whether the sum instead had belonged to and been paid discretionarily by others (*i.e.*, Al Kassar and/or Habbal).

On August 24, 2017, the parties filed various motions *in limine* relating to this subject. *See* Dkts. 149, 151, 155. On January 12, 2018, the Court denied these motions as moot in light of the fact that Habbal had not yet been deposed. Dkt. 170. The Court invited the parties, after completion of Habbal's testimony, to file anew any relevant motions, adjusted to account for Habbal's testimony. *Id.*

On February 15, 2018, defendants filed letters advising that Habbal's deposition had been taken in Spain on February 2, 2018 and seeking leave to move *in limine* to exclude her testimony as to the ownership of the $100,000, and to move anew for summary judgment. Dkts. 173–74. They represented that Habbal had testified that the money transferred to Kartagener had come from her personal account; that she had transferred the money at the telephonic direction of her incarcerated husband, Al Kassar; and that Al Kassar had told her that the transferred funds belonged to Moreno-Godoy. Based on this characterization of Habbal's deposition testimony, defendants argued, her testimony to the effect that Moreno-Godoy had owned the $100,000 was inadmissible hearsay. They further argued that, absent Habbal's testimony, there was no competent evidence to establish that the disputed $100,000 in fact belonged to Moreno-Godoy. Moreno-Godoy filed a letter, countering that Habbal was competent to testify about the ownership of the funds, and that other admissible evidence supported Moreno-Godoy's claim to have owned the $100,000. Dkt. 175.

On August 30, 2018, the Court issued an order authorizing renewed pretrial briefing, with Habbal's *de bene esse* deposition complete and her trial testimony now known. Dkt. 176. The Court directed the parties to contemporaneously litigate both (1) as a defense motion *in limine*, the admissibility of Habbal's testimony to the effect that Moreno-Godoy owned the $100,000 that she used to pay Kartagener, and (2) as a defense motion for summary judgment, whether— assuming *arguendo* that Habbal's testimony that Moreno-Godoy owned the $100,000 was held inadmissible hearsay for the truth of the matter asserted—sufficient evidence supported Moreno-Godoy's ownership of the $100,000 for his claims to reach the jury. *Id.* On September 19, 2018, defendants filed their opening combined motions and supporting papers. Dkts. 177–181. On October 5, 2018, Moreno-Godoy filed his opposition. Dkt. 182. On October 12 and 15, 2018, respectively, GDB and Kartagener filed their replies. Dkt 183–84.

### C.     Raghdaa Habbal's Testimony Regarding the $100,000

It is undisputed that Habbal transferred the $100,000 to Kartagener from her personal account at a bank in Beirut, Lebanon, and that she did so while both Moreno-Godoy and Al Kassar were in post-conviction custody in this District. *Moreno-Godoy II*, 2017 WL 2829815, at *8. As to the ownership of the $100,000, the gravamen of Habbal's testimony was that Moreno-Godoy had worked for Al Kassar's real estate company, Alkaport, for many years, and that money that Moreno-Godoy had earned for his work at Alkaport had been held by Al Kassar pursuant to a verbal agreement between the two men. Thus, when Habbal executed the wire transfer of $100,000, she was transferring money that she understood Moreno-Godoy to have earned and that Al Kassar or Alkaport had long held for him.

Specifically, Habbal testified as follows: Before he was detained, Habbal's husband, Al Kassar, had been "in charge" of Alkaport. March 2019 Felsenstein Decl., Ex. C ("Habbal Dep.")

at 17. Around 2008, when Al Kassar was detained, Habbal became Alkaport's sole director. At that time, Alkaport's bank accounts remained in Al Kassar's name. Habbal maintained a separate, personal account at Bank Audi in Beirut. Habbal testified that she has exclusive control over the Bank Audi account. *Id.* at 19.

Moreno-Godoy was an employee at Alkaport, although Habbal did not believe he was ever formally registered as such. *Id.* at 60. Habbal was told by Al Kassar that there was a "verbal agreement" in place governing the terms of Moreno-Godoy's employment, but there "was no documentation for this agreement." *Id.* at 59. As of the time that Moreno-Godoy and Al Kassar were detained, however, Habbal was as-yet unaware of any such arrangement between them. *Id.* at 24–25. Rather, after Al Kassar and Moreno-Godoy had been detained, Al Kassar told Habbal, by telephone, that there is "$100,000 for [Moreno-Godoy]." *Id.* at 35. Habbal testified that Al Kassar told her "this is money for [Moreno-Godoy], belonging to [Moreno-Godoy]. I kept it with us. [It is] a result of his work with me. This is his money. So this money can be used for him to employ a lawyer . . . ." *Id.* at 35.

After this phone conversation with Al Kassar, Habbal testified, she transferred $100,000 from her personal bank account to Kartagener. She did so on account of the phone conversation: "My husband told me that this money belonged to [Moreno-Godoy]. . . . [O]n that basis I transferred the money." *Id.* at 40–41. Habbal acknowledged that neither she nor Al Kassar had kept a ledger or other documentation reflecting that money was owed to or being kept for Moreno-Godoy. She also acknowledged that money at Alkaport had never been segregated for Moreno-Godoy, e.g., kept in a bank account separate from other corporate assets. *Id.* at 42–43.

## II. Applicable Legal Standards

### A. Motions *in limine*

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set up for trial, without lengthy argument at, or interruption of, the trial." *Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 257–58 (S.D.N.Y. 2015) (internal quotation marks omitted). Evidence should not be excluded on a motion *in limine* unless it is "clearly inadmissible on all potential grounds." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996) (internal quotation marks omitted). A court's ruling on such a motion is "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in [a party's] proffer." *Luce v. United States*, 469 U.S. 38, 41 (1984).

Federal Rule of Evidence 802 provides that, subject to certain exceptions, hearsay is not admissible. "The hearsay rule is generally said to exclude out-of-court statements offered for the truth of the matter asserted because there are four classes of risk peculiar to this kind of evidence: those of (1) insincerity; (2) faulty perception; (3) faulty memory, and (4) faulty narration, each of which decreases the reliability of the inference from the statement made to the conclusion for which it is offered." *United States v. Cummings*, 858 F.3d 763, 777 (2d Cir. 2017) (quoting *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 232 (2d Cir. 1999)). The rule against hearsay "ordinarily prohibits the admission of out-of-court statements by declarants on the theory that cross-examination can help test for these four classes of error, thus allowing the jury to weigh the evidence properly and to discount any that is too unreliable." *Id.* (internal alterations and quotation marks omitted).

### B. Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III. Discussion

Moreno-Godoy's claims against GDB and Kartagener sound in contract and quasi-contract and seek, as damages, the $100,000 that the defendants allegedly misapplied. The Court previously held that to prevail on these claims, Moreno-Godoy must demonstrate that "it was he, rather than Al Kassar or Al Kassar's family, who owned the $100,000 which [Habbal]

transferred to Kartagener for Moreno-Godoy's appellate representation, and which was later

given by Kartagener to Stavis and GDB." *Moreno-Godoy II*, 2017 WL 2829815, at *5.

Defendants now move *in limine* to exclude Habbal's testimony to the extent that she stated that

Moreno-Godoy owned the $100,000. Defendants emphasize that Habbal has only second-hand

knowledge of the money's ownership. They argue that her statements regarding Moreno-

Godoy's ownership of the disputed funds are hearsay. Defendants also move for summary

judgment. They argue that, assuming Habbal's statements are held inadmissible to establish

Moreno-Godoy's ownership of the $100,000 that Habbal paid to Kartagener, defendants are

entitled to summary judgment on all remaining claims. That is because, they argue, the record

lacks sufficient evidence to support the conclusion that Moreno-Godoy owned the $100,000.

The Court addresses these issues in turn. The Court holds, first, that Habbal's testimony

that Moreno-Godoy owned the $100,000 is inadmissible hearsay if received for the truth of the

matter asserted. Second, the Court holds, with defendants, that—given the gaps in Habbal's

knowledge exposed by her *de bene esse* deposition—there is inadequate evidence from which a

jury could infer that the disputed funds belonged to Moreno-Godoy. This requires entry of

summary judgment for defendants.

A.      **Motions *in Limine* as to Habbal's Testimony**

Defendants argue that, insofar as Habbal testified that Al Kassar told her that Moreno-

Godoy owned and had been owed the $100,000 by Al Kassar or his company, that testimony

cannot be received for the truth of the matter asserted. Defendants note that, by Habbal's

admission, she lacks any personal knowledge as to any debts owed by either Al Kassar or

Alkaport to Moreno-Godoy. Rather, defendants note, Habbal's testimony on this point consists

solely of her hearsay recapitulation of a telephonic statement that her husband, Al Kassar,

allegedly made to her shortly before she transferred the money to Kartagener. Moreno-Godoy does not seriously dispute that this statement is hearsay if taken for the truth of the matter asserted. Rather, Moreno-Godoy argues that the statement may properly be received for other purposes.

When a witness repeats a declarant's out-of-court statement and that statement is offered for the truth of the matters asserted in the statement, such testimony, absent an alternative basis for admission, is inadmissible hearsay. *See* Fed. R. Evid. 801(c); *see also Abascal v. Fleckenstein*, 820 F.3d 561, 564–65 (2d Cir. 2016) ("Hearsay is a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted."). Here, defendants are unavoidably correct that Habbal's statement recounting Al Kassar's statement to her is inadmissible hearsay if taken for the truth of the matter he asserted to her, *i.e.*, to the effect that Moreno-Godoy owned, or was owed, or had a right to, the $100,000.

Indeed, Habbal squarely admitted in her testimony that her knowledge of any claim that Moreno-Godoy might have to this money is secondhand. She disclaimed personal knowledge of any financial arrangement between Moreno-Godoy and Al Kassar or Alkaport. Her firsthand knowledge was limited to knowing that Moreno-Godoy had worked for Al Kassar as an Alkaport employee. Beyond that, however, she testified that she was unaware of Moreno-Godoy's finances before 2008, when Moreno-Godoy and Al Kassar were detained. *See* Habbal Dep. at 24–25 ("Q: Before they were detained, were you aware of what their financial arrangement was? . . . A: No, I never because at the time they were detained I was in Syria."). Habbal also denied later learning of any such financial arrangement by virtue of her assumption of control of Alkaport in 2008, after Al Kassar and Moreno-Godoy had been taken into custody. *Id.* at 14.

She testified that she has never become aware of any documentation of a financial agreement between Moreno-Godoy and Al Kassar or Alkaport. *Id.* at 42–43 ("Q: Did you keep any ledger of what money was [Moreno-Godoy's] and what money was [Al Kassar's]? A: No. Q: Okay. Did you segregate [Moreno-Godoy's] money into a different [bank] account? A: No. Q: Do you have any documents showing how much money belonged to [Moreno-Godoy]? A: No.").

Instead, Habbal admitted, the sole basis for her present belief that Moreno-Godoy had been owed the $100,000 is a telephone conversation with her incarcerated husband, Al Kassar. Habbal testified that Al Kassar called her and told her:

> [T]his is money for [Moreno-Godoy], [it] belong[s] to [Moreno-Godoy]. I kept it with us. And—out of his work with me—as a result of his work with me. This is his money. So this money can be used for him to employ a lawyer or so.

*Id.* at 35. As a result of this conversation, Habbal testified, she executed the transfer of the $100,000. Asked what her basis was for believing the money belonged to Moreno-Godoy, Habbal testified: "My husband told me that this money belonged to [Moreno-Godoy]. Yes, on that basis I transferred the money." *Id.* at 40–41.

Habbal's testimony, if offered to prove that Moreno-Godoy in fact owned the $100,000, is rank hearsay. Habbal's stated belief that Moreno-Godoy owned the $100,000 derives solely from statements made to her by Al Kassar. She testified that it was "on the basis" of Al Kassar's representation to her that Moreno-Godoy owned the $100,000 that she executed the transfer. *Id.*

Moreno-Godoy counters by noting that "Al Kassar's instructions to send Mr. Moreno-Godoy's money . . . to Kartagener are not hearsay because . . . instructions or commands are not offered for the truth of the matter asserted therein." Moreno-Godoy Mem. at 7. But that argument does not engage with the important proposition pursued by defendants' motion *in*

*limine*, to wit, that Habbal's testimony about Al Kassar's statement to her cannot be received for the truth. Moreno-Godoy, tellingly, does not seriously contest that point.

Moreno-Godoy's observation that a statement offered for the limited purpose of explaining another's ensuing conduct is not hearsay is of course correct: "Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay." *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999). Thus, receipt of Al Kassar's statement to Habbal, if received for the limited purpose of explaining her subsequent action (*i.e.*, the transfer of the money to Kartaganer) would not violate Rule 801(c).

However, the fact that a statement is not precluded by the hearsay rules does not make it necessarily admissible. A statement received for a limited non-hearsay purpose must also satisfy Federal Rule of Evidence 403, which requires that a statement's probative value not be substantially outweighed by the potential for unfair prejudice, confusion, and delay. The parties here have not briefed how Rule 403 would apply to Habbal's testimony about Al Kassar's statement about money owed to Moreno-Godoy if offered solely for the non-hearsay purpose of explaining Habbal's subsequent conduct.

In light of the Court's ruling, *post*, that defendants are entitled to summary judgment on the issue of ownership, the Court has no occasion to resolve with finality how Rule 403 would apply to such a bid. It suffices to observe that there is a substantial question whether Moreno-Godoy could prevail under Rule 403 in securing admission for this purpose of the aspect of Habbal's testimony quoting Al Kassar, an out-of-court declarant, that the $100,000 "belongs" to Moreno-Godoy. On the Court's review of Habbal's testimony, it appears that her account of Al Kassar's instruction to Habbal to transfer $100,000 to Kartaganer could easily be received

15

without a need for the jury also to hear Al Kassar's adjoining explanation that this sum "belonged" to Moreno-Godoy "as a result of his work" for Al Kassar. With Al Kassar's instruction to transfer the money received in evidence, his statements that Moreno-Godoy owned the money, and how he had allegedly came to own it, appear to lack any proper probative value.[3] And on the opposite side of the Rule 403 balance, Al Kassar's statement as to the money's ownership, even if received subject to a limiting instruction, could confuse the jury in its consideration of the disputed issue of whether Moreno-Godoy owned the allegedly misapplied funds. A jury might find it hard not to consider that statement for the truth of the matter asserted. Were this case proceeding to trial, close attention to such Rule 403 considerations would be required before the Court could admit, even for a purpose other than for the truth of the matter asserted, Al Kassar's statements to Habbal to the effect that Moreno-Godoy was owed $100,000 for his services to Alkaport.

Accordingly, the Court grants the motion *in limine*. Habbal's testimony regarding the ownership of the $100,000 is inadmissible, if offered to show that Moreno-Godoy in fact owned the disputed funds.

### B.  Motion for Summary Judgment as to Ownership of the $100,000

GDB and Kartagener argue that, with Habbal's testimony as to ownership excluded, summary judgment for the defense is warranted. They note that the Court's initial decision denying them summary judgment hinged on Habbal's one-page declaration in which she attested, seemingly on the basis of personal knowledge, to Moreno-Godoy's ownership of the

---

[3] In theory, these explanations could have had independent probative value for explaining the transfer, e.g., if Habbal's testimony had been that Al Kassar's explanation of how Moreno-Godoy came to own the money caused her to access a particular bank account to retrieve the $100,000. Moreno-Godoy, however, has not articulated such an explanation. The Court's review of Habbal's deposition transcript did not reveal evidence to this effect.

$100,000. Moreno-Godoy counters that, even if Habbal's testimony as to ownership is stricken, other testimony would permit a jury to find that the $100,000 transferred to Kartagener belonged to him.

In assessing this claim, the Court observes that Moreno-Godoy's theory as to how he came to be owed $100,000 has shifted markedly during this litigation. The Court begins with a chronology of the pertinent testimony and advocacy on this issue, as such informs the summary judgment analysis.

Moreno-Godoy testified in his June 26, 2016 deposition that he owned the $100,000 transferred to Kartagener because these funds had come from the sale of his personal assets, including luxury vehicles and an expensive watch collection. *See* March 2019 Felsenstein Aff., Ex. A ("Moreno-Godoy Dep.") at 21 ("And so I had some automobiles, cars, some [jet skis] . . . . At the time of my arrest I had many, maybe ten and at least seven or eight [watches], seven or eight of these were expensive."). Moreno-Godoy testified there that, before his criminal trial began, he had told members of the Al Kassar family, "sell my stuff, make money, get some money." *Id.* at 45. He testified that he had asked that his assets be sold because he "was anticipating a very long [legal] fight," *id.* at 46, and because Al Kassar had already expended hundreds of thousands of dollars for the defense, *id.* at 47.

Al Kassar's roughly contemporaneous deposition testimony, taken June 1, 2016, is consistent with that theory of ownership. He testified that "[t]he $100,000 came from the selling of [Moreno-Godoy's] property. One of them I remember was a big thing, two big cars." March 2019 Felsenstein Aff., Ex. B ("Al Kassar Dep.") at 56. And Habbal, for her part, in the one-page declaration dated February 7, 2017, on the basis of which the defense's initial motion for summary judgment was denied, made the same claim. She attested that Moreno-Godoy "was

also owner of car brand AUDI . . . which was sold upon his request and the price paid was collected by [Alkaport] on his behalf and kept as savings for him." Dkt. 123-4 ("Habbal Decl."). Habbal's declaration, however, also contained language consistent with a second theory by which Al Kassar might be claimed to have owed money to Moreno-Godoy. She attested that Alkaport "agreed to pay him remuneration, and upon his request, the company kept this remuneration in its bank account as *savings* for him." *Id.* (emphasis in original). Habbal's declaration added: "The total amount of savings of Mr. Moreno"—the proceeds from the sale of Moreno-Godoy's personal property—plus the "remuneration" that Alkaport held for him "were equivalent to [$100,000] (one hundred thousand US dollars) [and] were remitted upon his instructions on the 18th of February, 2009 to his attorney MR. STEVEN R. KARTAGENER." *Id.* (emphasis omitted).

In *Moreno-Godoy II*, the Court, assessing this evidence, denied the parties' competing motions for summary judgment. The Court found a material dispute of fact as to whether Moreno-Godoy owned the $100,000. Moreno-Godoy's theory was that the $100,000 that Habbal had furnished to Kartagener had come principally from the sale of Moreno-Godoy's personal property, including two luxury automobiles, an expensive watch collection, and several jet skis. But, the Court held, Moreno-Godoy was not competent to so testify on this point because he had been in prison at the time of the transfer to Kartagener and had not participated in the sale of such property or in the retrieval or payment of the $100,000. He lacked first-hand knowledge of the origins of the $100,000. 2017 WL 2829815, at *8. The same was true of Al Kassar. Al Kassar had attested that Moreno-Godoy had directed him to "sell these [two] cars" and other property, and this sale had produced the $100,000 sent to Kartagener. Al Kassar Dep. at 47. But, having been imprisoned at the time, Al Kassar lacked personal knowledge of this

fact.  And, insofar as his knowledge derived from his wife, his testimony was inadmissible hearsay.  2017 WL 2829815, at *8.  In contrast, the Court noted, Habbal had been a percipient witness to the payment of the $100,000 and appeared to have been a percipient witness to the source of the money.  Her testimony thus did not appear to be hearsay.  To be sure, the Court noted, Habbal's version of events raised questions of credibility.  But, viewed in the light most favorable to Moreno-Godoy, "Habbal's assertion that the $100,000 that she personally sent to Kartagener derived from Moreno-Godoy's savings and from the sale of his property, assuming she testifies to this effect at trial and is credited by the trier of fact, would provide a basis on which to find that the $100,000 belonged to Moreno-Godoy."  *Id.*  The Court therefore denied defendants' motions for summary judgment, finding that Habbal's testimony could potentially establish Moreno-Godoy's ownership of the allegedly misapplied $100,000.

On February 2, 2018, several months later, Habbal was deposed pursuant to Fed. R. Civ. P. 32(a)(4), the Court having ruled that her *de bene esse* deposition would serve as her trial testimony.[4]  At her deposition, Habbal abandoned her earlier version of events that the $100,000 substantially had come from the sale of Moreno-Godoy's personal property, such as his luxury cars.  On the contrary, as to the cars, Habbal testified that she had transferred the proceeds from the sale of Moreno-Godoy's cars to Moreno-Godoy's daughters, Habbal Dep. at 30–31, and not to Kartagener.  This statement conflicted with Habbal's statement in her earlier declaration that one of Moreno-Godoy's cars was "sold upon his request and the price paid was collected by [Alkaport] on his behalf and kept as savings for him."  Habbal Decl. at 1.  Instead, as noted,

---

[4] The Court authorized this measure after plaintiff's counsel represented that Habbal, a resident of Spain, was unavailable under Rule 32(a)(4)(B) but was willing to testify in Spain.  *See* Dkt. 142 (plaintiff's request for Rule 32(a)(4) testimony); Dkt. 143 (defense objection); Dkt. 144 (authorizing Habbal's *de bene esse* deposition, to be conducted on videotape).

Habbal now testified that the $100,000 she transferred to Kartagener had come from a personal bank account of hers and reflected money which she understood—based on a phone call with her husband—that Moreno-Godoy had earned as an Alkaport employee and remained owed to him. *Id.* at 35.

In light of Habbal's deposition testimony, Moreno-Godoy appears to have abandoned the theory of ownership on which his claim of misapplication previously turned: that he owned the $100,000 as fruits of the sale of his personal property. Rather, Moreno-Godoy is forced now to embrace the one theory consistent with Habbal's testimony: that when Habbal transferred the $100,000 to Kartagener, she was discharging a debt that Alkaport had long owed to Moreno-Godoy representing earnings that it had never distributed to him.

To withstand defendants' renewed motion for summary judgment, therefore, Moreno-Godoy must identify evidence from which a jury reliably could conclude that, as of the point when Habbal transferred the $100,000 to Kartagener, her company, Alkaport, in fact owed money to Moreno-Godoy representing undistributed earnings. Habbal's testimony, however, is incompetent to establish any such debt or arrangement. She disclaimed such first-hand knowledge. And, she testified, Alkaport, lacks any records reflecting any such obligation. Although Habbal can testify that she transferred the $100,000 at Al Kassar's direction, she is incompetent to testify whether this money reflected a genuine debt to Moreno-Godoy, as opposed to being a discretionary outlay by Al Kassar to fund the legal services Kartagener stood to provide jointly to him and his co-appellant Moreno-Godoy.

On the Court's close review, the record is devoid of admissible evidence to the effect that, as of February 18, 2009, Alkaport or Al Kassar were holding $100,000 for Moreno-Godoy, reflecting undistributed earnings of his. In arguing for this proposition, Moreno-Godoy seizes on

a single statement from his own deposition. Moreno-Godoy testified that he entered into a contract as an Alkaport employee. Moreno-Godoy Dep. at 13. Asked if he received "any payments for the work that [he] did" on that contract, Moreno-Godoy replied, "No. I told Monzer Al Kassar just keep it, if I need anything, I'll ask for it. I had my own business." *Id.* at 14. This testimony, Moreno-Godoy now argues, establishes that "Al Kassar was asked to 'keep' unpaid wages . . . which accumulated over a decade of work" and that this fact would permit the trier of fact to "infer that Al Kassar held a substantial sum of money belonging to Mr. Moreno-Godoy in his or Alkaport's bank accounts." Moreno-Godoy Mem. at 3.

This argument puts far more freight on the single word "keep" than it, read in context, can fairly bear. Moreno-Godoy construes this word as shorthand to connote an arrangement whereby he earned money as an Alkaport employee which was long kept for him by Alkaport and to which he had a claim of right. But that characterization grossly distorts both Moreno-Godoy's and Al Kassar's testimony. Neither so testified. In his deposition, Moreno-Godoy testified that he had *declined* money from Al Kassar for other work because he felt that he was already adequately compensated by Al Kassar's payment of his room and board. *See* Moreno-Godoy Dep. at 13 (Q: And with respect to the first contract [working in Al Kassar's home], did you receive payments? A: I did receive money in the first month after that. I said please, no more, just keep it. I've got a house, food and *that's all I need*." (emphasis added)). Further, Moreno-Godoy and Al Kassar each testified that Moreno-Godoy, while working for Al Kassar, had been treated like a member of Al Kassar's family. As such, Al Kassar often chose to cover Moreno-Godoy's expenses or give him money or other gifts. *See* Moreno-Godoy Dep. at 18 ("I never paid a single Peso in rent or for expenses or for autos."); *id.* at 22 (testifying that Al Kassar gifted Moreno-Godoy a Cartier watch); Al Kassar Dep. at 25 ("When [Moreno-Godoy]'s

troubled I have to give some money."). Notably, however, neither witness at any point suggested that Moreno-Godoy had ever accumulated unpaid earnings from Alkaport or Al Kassar, or that Al Kassar or Alkaport were holding earnings for Moreno-Godoy that were owed to him. Quite the contrary, Al Kassar testified that when Moreno-Godoy occasionally approached him for money "to send to his family . . . [or] to buy a car," Moreno-Godoy "did not come as an employee. He came as a guest along after ten years" and "bec[a]me like part of the family." Al Kassar Dep. at 23–25.

And, when deposed, neither Moreno-Godoy nor Al Kassar embraced Moreno-Godoy's present theory. Neither claimed that the $100,000 transferred to Kartagener came from undistributed earnings of Moreno-Godoy at Alkaport. Neither testified that such a sum—or any sum—had been held by Alkaport pursuant to an agreement between them. Rather, Moreno-Godoy testified that the funds came from the sale of various luxury vehicles and products, *see* Moreno-Godoy Dep. at 43–50, and Al Kassar stated that the $100,000 "came from the selling of [Moreno-Godoy's] property," *see* Al Kassar Dep. at 56. Moreno-Godoy has now pivoted from that theory for reasons that are self-evident: Habbal's later testimony foreclosed it. But the earlier deposition testimony of Moreno-Godoy and Al Kassar cannot be contorted to support the alternative theory on which Moreno-Godoy now seizes.

In the end, the evidence would permit a factfinder to conclude that Moreno-Godoy worked for Alkaport and was compensated for his labor in room and board. It would also support a finding that Al Kassar often covered Moreno-Godoy's other expenses and gave gifts of money or goods to Moreno-Godoy. But the summary judgment record lacks evidence—of any kind—that would support the proposition necessary for Moreno-Godoy's claim to go forward here: that in February 2009, Moreno-Godoy, long after his work for Al Kassar, retained an

entitlement to $100,000 of Al Kassar's or Alkaport's money, such that Habbal's transfer to Kartagener was a transfer of funds belonging to Moreno-Godoy. Moreno-Godoy has not adduced evidence to support the conclusion that Moreno-Godoy ever generated earnings that Alkaport or Al Kassar retained for him, let alone that, years later, Alkaport held an undocumented $100,000 to which Moreno-Godoy had a claim of right. The assembled evidence instead permits no more than a finding that Al Kassar—Moreno-Godoy's employer, benefactor, friend, and co-defendant—made a discretionary decision to fund Kartagener's work to jointly represent Al Kassar and Moreno-Godoy in post-verdict proceedings, including appeal.

That defect is fatal to Moreno-Godoy's remaining claims. As the Court previously held, to prevail on his contract claims, Moreno-Godoy must prove damages. *Moreno-Godoy II*, 2017 WL 2829815, at *6. The same is true with respect to his quasi-contract claims, which sound in unjust enrichment, money had and received, and constructive trust. *See id.* (noting that each of Moreno-Godoy's equitable claims requires proof of damages). The Court explained that

> [i]n the context of this case, proving damages on these claims require[s] Moreno-Godoy to prove ownership of the $100,000, such that its misapplication damaged him. Moreno-Godoy does not articulate any alternative theory of damages. He does not allege, for example, deficient legal representation on appeal (nor is there evidence of the same). Therefore, to prove the damages element on each of his surviving claims, Moreno-Godoy must prove that the $100,000 belonged to him—as opposed to, say, Al Kassar or Al Kassar's family.

*Id.* at *7. Because there is insufficient evidence from which a factfinder can infer that Moreno-Godoy owned the $100,000 transferred to Kartagener, Moreno-Godoy cannot prove damages to himself—a necessary element of all his claims. And Al Kassar, who could presumably claim such ownership, is not a plaintiff in this case. The Court therefore grants summary judgment to GDB and Kartagener on all of Moreno-Godoy's remaining claims.

**CONCLUSION**

For the foregoing reasons, the Court grants defendants' motions *in limine* and motions for summary judgment and dismisses Moreno-Godoy's remaining claims. The Court respectfully directs the Clerk of Court to terminate the motions pending at docket entries 177 and 180 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: April 11, 2019
      New York, New York