IN THE

# United States Court of Appeals

## For the Second Circuit

_____

AUGUST TERM, 2020

ARGUED: JUNE 2, 2021
DECIDED: JULY 30, 2021

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jul 30 2021

No. 19-1279

LUIS FELIPE MORENO-GODOY,

*Plaintiff-Appellant,*

*v.*

STEVEN R. KARTAGENER, ESQ.,

*Defendant-Cross-Claimant-Appellee,*

GALLET DREYER & BERKEY, LLP.,

*Defendant-Counter-Defendant-Appellee,*

ROGER L. STAVIS, ESQ.,

*Defendant-Appellee,*

_____

Appeal from the United States District Court
For the Southern District of New York.
14-CV-07082 – Paul Engelmayer, *District Judge.*

_____

CERTIFIED COPY ISSUED ON 07/30/2021

19-1279
*Moreno-Godoy v. Kartagener*

1   Before: CALABRESI, MENASHI, *Circuit Judges,* AND COTE, *District Judge.*[1]

2                                    _____

3

4         Luis Felipe Moreno-Godoy and Monzer Al Kassar retained attorney Roger

5   L. Stavis of Gallet Dreyer & Berkey ("GDB") for a flat fee of $125,000 to represent

6   them in a criminal appeal. Seeking additional legal support, they also retained

7   attorney Steven Kartagener for a flat fee of $100,000. Al Kassar's wife, Raghdaa

8   Habbal, transferred both fees to the attorneys. Moreno-Godoy, Al Kassar, and

9   Habbal all assert that the $100,000 transferred to Kartagener belonged to

10  Moreno-Godoy. Then, when Kartagener was unable to work on the appeal,

11  Moreno-Godoy asked for the money back. Instead, Kartagener transferred it to

12  Stavis, who kept it. Moreno-Godoy subsequently initiated this action, alleging

13  breach of contract and quasi-contract claims. The district court granted summary

14  judgment to all three defendants, GDB, Stavis, and Kartagener.

15        We conclude that the district court erred in granting summary judgment to

16  defendants on Moreno-Godoy's breach-of-contract claim because, under New

17  York law, Moreno-Godoy can maintain a breach-of-contract claim without any

18  showing that the $100,000 belonged to him. Although Moreno-Godoy's quasi-

19  contract claims against Stavis and GDB do require a showing that he owned the

20  money, we further conclude that the district court erred in granting summary

21  judgment to those defendants on those claims because there is sufficient evidence

22  in the record from which a jury could conclude that the money indeed belonged

23  to Moreno-Godoy. Finally, we hold that summary judgment for Stavis in his

24  individual capacity was also inappropriate.

25        We therefore VACATE the grants of summary judgment to GDB, Stavis,

26  and Kartagener and REMAND for proceedings consistent with this opinion.

27

--------

[1] Judge Denise Cote, of the United States District Court for the Southern District of New
York, sitting by designation.

JOHN M. TANSKI, Axinn, Veltrop & Harkrider LLP (Drew A. Hiller, Craig M. Reiser, *on the brief*), *in support of Plaintiff-Appellant.*

DAVID A. ROBINSON, Esq., *in support of Defendant-Appellee* Steven R. Kartagener, Esq.

DAVID S. DOUGLAS, Gallet Dryer & Berkey LLP (Jared B. Foley, *on the brief*), *in support of Defendants-Appellees* Gallete Dreyer & Berkey, LLP and Roger L. Stavis, Esq.

CALABRESI, *Circuit Judge*:

After a jury convicted them of several federal crimes, Plaintiff-Appellant Felipe Moreno-Godoy and Monzer Al Kassar entered into two separate retainer agreements for appellate legal services. The first stipulated that the law firm Gallet Dreyer & Berkey LLP ("GDB") would provide them both with "all post-verdict legal services" for a flat fee of $125,000 ("GDB Agreement"). JA 217. All agree that the $125,000 paid to GDB belonged to Al Kassar. When Moreno-Godoy expressed interest in adding an additional lawyer to their team, Moreno-Godoy and Al Kassar brought on Steven R. Kartagener as additional counsel at the suggestion of GDB partner Roger L. Stavis. They signed a second retainer agreement ("Kartagener Agreement") providing that Kartagener would represent both men in post-verdict legal proceedings for a flat fee of $100,000. Because both men were in prison, Al Kassar's wife Raghdaa Habbal handled the payment to the respective attorneys. Moreno-Godoy, Al Kassar, and Habbal all assert that the $100,000 paid to Kartagener belonged to Moreno-Godoy.

But Kartagener never provided any legal services. Nor did he return the $100,000 fee, as Moreno-Godoy requested. Instead, he transferred it to Stavis, who in due course remitted them to GDB.

Moreno-Godoy brought this lawsuit. He alleged breach of contract against Stavis, GDB, and Kartagener, as well as quasi-contract claims for unjust enrichment, money had and received, and constructive trust against Stavis and GDB. The district court (Engelmayer, J.) believed that Moreno-Godoy's claims all turned on whether he could prove ownership of the $100,000, because otherwise, Moreno-Godoy could not prove that he was damaged by the defendants' breach. The district court did not find enough admissible evidence in the record for the question of Moreno-Godoy's ownership of the money to reach a jury, and so granted summary judgment to defendants.

We see things differently. To prove damages for his breach-of-contract claim, Moreno-Godoy did not need to make any showing that he owned the $100,000. *See Markson v. Markson's Furniture Stores*, 195 N.E. 824, 826 (N.Y. 1935). Rather, he was entitled to expectation damages, so long as he could "show a stable foundation for a reasonable estimate" of Kartagener's services. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007); *see also Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383 (1974) (articulating the "stable foundation for reasonable estimate" standard); *Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 109 (1919) (requiring "some basis of computation" for expectation damages).

To prevail on his quasi-contract claims, however, Moreno-Godoy did need to prove that he owned the $100,000. On our *de novo* review of the record, we find

1  sufficient evidence for these claims to proceed. If Moreno-Godoy can convince a

2  jury that he owned the funds paid to Kartagener, he may prevail on the quasi-

3  contract claims against Stavis and GDB, assuming, of course, that he can also

4  satisfy the other elements of those claims.

5      Finally, the district court granted summary judgment to Stavis in his

6  personal capacity on the grounds that New York Partnership Law § 26(a) shields

7  him from personal liability. Based on the record before us, we believe a jury

8  could find that Stavis committed a "wrongful act or misconduct" for which he

9  could be held personally liable under New York Partnership Law § 26(b).

10      We therefore VACATE the district court's grants of summary judgment to

11  GDP, Kartagener, and Stavis, and REMAND for proceedings consistent with this

12  opinion.

## BACKGROUND

**A. Factual Background**

15      In November of 2008, a federal jury convicted Felipe Moreno-Godoy and

16  Monzer Al Kassar of several criminal charges, including conspiracy to kill

17  officers and employees of the United States, and money laundering. They asked

18  their trial counsel, Roger L. Stavis, Esq., of the firm Gallet Dreyer & Berkey

19  ("GDB") to represent both of them in all post-conviction proceedings. While

20  incarcerated, Moreno-Godoy and Al Kassar signed a retainer agreement to that

21  effect; it provided that GDB would represent both of them for a flat fee of

22  $125,000 ("GDB Agreement"). Al Kassar's family transferred the money to GDB

23  without incident.

1   Around that time, Moreno-Godoy indicated that he wanted additional

2   legal support for the appeal, so Stavis suggested that Moreno-Godoy also retain

3   Stavis's friend, attorney Steven R. Kartagener. On that advice, Moreno-Godoy

4   and Al Kassar signed a second retainer agreement with Kartagener, which

5   provided that Kartagener, for a flat fee of $100,000, would represent both of them

6   in post-verdict legal proceedings ("Kartagener Agreement"). Raghdaa Habbal,

7   Al Kassar's wife, sent the money to Kartagener from her personal account at a

8   bank in Beirut, Lebanon.

9   Moreno-Godoy claims that the $100,000 fee for Kartagener's services

10  belonged to him. He says that it came out of his savings, and that Habbal

11  transferred it to Kartagener on his behalf. Al Kassar and Habbal both testified

12  that the money belonged to Moreno-Godoy, and no one else claims to have

13  owned the money.

14  Kartagener, unable to obtain a security clearance to review classified

15  materials relevant to the case, did not provide the bargained-for appellate

16  services. Before discussing it with his clients, Kartagener transferred $90,000 of

17  his retainer to GDB.  Moreno-Godoy requested that Kartagener return the

18  retainer fee, but Kartagener did not respond. Instead, Kartagener transferred the

19  remaining $10,000 to Stavis.

20  Moreno-Godoy wrote to Stavis for an explanation. "I believe that there is

21  an error," wrote Moreno-Godoy, "because we signed a contract of agreement on

22  December 9, 2008, where you were to represent us as primary counsel on our

23  defense. On the subsequent month, I decided to have additional help and a

24  different opinion of someone that would provide with new ideas. . . .

6

1 [U]ltimately, I accepted your suggestion to hire your friend Mr. Steven

2 Kartagener on basis you continue to be primary counsel in the defense." JA 162-

3 163.

4     Stavis responded, "I always considered you my 'client' even if Steven

5 Kartagener was coming in to work with me on your case." JA 163. He told

6 Moreno-Godoy, "Mr. Kartagener has refunded the retainer to me and I am using

7 it to represent you on this appeal." JA 163. When pressed further, Stavis and

8 GDB expressly refused to return the $100,000 to Moreno-Godoy.

9     For his part, Al Kassar repeatedly asked Stavis to return the money to

10 Moreno-Godoy, visit Moreno-Godoy in prison, and establish a new contract with

11 him in light of Kartagener's inability to participate. Instead, Stavis never visited

12 Moreno-Godoy or spoke to him by phone about the Kartagener fee. Neither

13 party suggests that Stavis and Moreno-Godoy entered into a separate agreement

14 which would entitle Stavis to an additional $100,000.

15 **B. Procedural Background**

16     Proceeding *pro se*, Moreno-Godoy initiated this action on August 4, 2014.

17 He pled claims for breach of contract, breach of fiduciary duty, and malpractice.

18 After the district court granted Defendants' motions to dismiss the fiduciary

19 duty and malpractice claims—but not the breach-of-contract claim—Moreno-

20 Godoy obtained counsel and filed an amended complaint, pleading claims for

21 breach of contract against Stavis, GDB, and Kartagener, as well as quasi-contract

22 claims for unjust enrichment, money had and received, and constructive trust

23 against Stavis and GDB.

The parties cross-moved for summary judgment. Defendants argued that without proof of ownership, Moreno-Godoy could not prove damages and therefore could not proceed. In turn, Moreno-Godoy argued that it was not necessary for him to prove ownership, but alternatively, that he had proven ownership as a matter of law.

The court determined that in order to prevail on any of his claims, Moreno-Godoy would need to prove that he in fact owned the disputed money. The court understood Moreno-Godoy to be seeking only restitution damages, in other words, to have the $100,000 returned to him. On the district court's theory, Moreno-Godoy could not seek restitution of money that was never his to begin with. To that end, it found that Moreno-Godoy and Al Kasser's deposition testimony would be insufficient to establish Moreno-Godoy's ownership because neither of them had been a percipient witness to the transfer. The court noted, however, that Moreno-Godoy had also submitted a declaration from Habbal, who could potentially testify about the transfer from her personal knowledge, and thus provide a basis to find that the money did belong to Moreno-Godoy. With that possibility left open, the district court denied summary judgment to GDB, Kartagener, and Moreno-Godoy.

At the same time, however, the district court granted summary judgment for defendant Stavis. Citing New York Partnership Law § 26(b), it found that Stavis was acting in his capacity as a GDB partner in a limited liability partnership when he requested and accepted the $100,000 from Kartagener, and that he was therefore immune from liability in his personal capacity.

In the lead-up to trial, Moreno-Godoy sought leave for Habbal, who lives in Spain, to provide her trial testimony by a pretrial video deposition. The court granted the motion, and Habbal testified that she had sold Moreno-Godoy's cars and "put the money for him." JA 637. She, however, said that she eventually gave that money to Moreno-Godoy's daughters and suggested that the money paid to Kartagener instead came out of savings Moreno-Godoy had accrued over years of working for Alkaport, Al Kassar's company. Despite this possible inconsistency, Habbal emphasized her belief that the money belonged to Moreno-Godoy. She said that Al Kassar had called her to tell her "that this is money for Felipe, belong to Felipe." JA 644. Later she spoke directly to Moreno-Godoy, who "talked to me and said the name of the lawyer to transfer the money to him." *Id.*

In view of Habbal's testimony, defendants moved *in limine* to exclude her testimony as to the ownership of the $100,000, and also moved for summary judgment a second time. They argued that Habbal's testimony was inadmissible hearsay because the only source of her knowledge regarding who owned the money was conversations with her husband. Moreno-Godoy countered that Habbal was competent to testify about the ownership of the funds, and that other admissible evidence supported his claim to it as well. The district court agreed with the defendants. It excluded Habbal's testimony on the grounds that it would be inadmissible if offered for its truth value. And, absent Habbal's testimony, the court found that Moreno-Godoy could not maintain any of his claims.

The district court concluded that the remaining evidence in the record was insufficient to support Moreno-Godoy's claim to the money. It noted that his theory of ownership had changed: Before Habbal's deposition, Moreno-Godoy had maintained that he instructed members of the Al Kassar family to sell some valuable assets, like cars and watches, to pay for his legal defense. Al Kassar's testimony and Habbal's initial declaration advanced the same theory. After Habbal's deposition, however, Moreno-Godoy's ownership theory changed to suggest that Moreno-Godoy had earned the money as an Alkaport employee.

As a result, the district court determined that the record contained insufficient admissible evidence to support Moreno-Godoy's ownership claim. Without proof of ownership, the district court reasoned, Moreno-Godoy could not prove that defendants' breach damaged him, and hence granted summary judgment to defendants on all of the remaining claims.

On appeal, Moreno-Godoy argues that the district court erred in granting summary judgment to the defendants and in denying him summary judgment. He contends that New York law does not require him to prove ownership to maintain a breach-of-contract claim. In the alternative, he argues that even if proof of ownership were required, the record supports his claim that the money was his. Finally, he argues that Stavis should be reinstated as a defendant because he is personally and fully liable under New York Partnership law.

Defendants do not here contest the underlying breach of contract. They instead mount a defense based on the purported necessity of determining whose $100,000 paid Kartagener's fee. For the following reasons, we agree with Moreno-Godoy.

1      **DISCUSSION**

2          It is tempting to boil this case down to one question: Who owns the

3    $100,000 that Habbal paid to Kartagener? But that would be a mistake. Under

4    New York law, Moreno-Godoy can maintain a breach-of-contract claim without

5    any showing that he owned the $100,000. His additional quasi-contract claims for

6    unjust enrichment, money had and received, and constructive trust, however, do

7    require such proof. And we find that the record contains sufficient admissible

8    evidence from which a jury could determine that Moreno-Godoy owned the

9    funds, and hence that he may pursue these quasi-contract claims. We also find

10   sufficient evidence in the record from which a jury could conclude that Stavis can

11   be held personally liable for refusing to return funds that did not belong to him

12   or to his firm.

13         We review a district court's grant of summary judgment de novo. *ING*

14   *Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018).

15   "Summary judgment is properly granted when there is no genuine issue of

16   material fact and one party is entitled to judgment as a matter of law." *Zalaski v.*

17   *City Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam); see Fed.

18   R. Civ. P. 56(a). A dispute about a "genuine issue" exists for summary judgment

19   purposes where the evidence is such that a reasonable jury could decide in the

20   nonmovant's favor. *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). "[I]n

21   assessing the record to determine whether there is a genuine issue to be tried as

22   to any material fact, the court is required to resolve all ambiguities and draw all

23   permissible factual inferences in favor of the party against whom summary

24   judgment is sought." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

**A. Breach of Contract**

To prevail on a breach-of-contract claim in New York, a plaintiff must prove: "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach." *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x 349, 350–51 (2d Cir. 2005); *accord Riccio v. Genworth Fin.*, 124 N.Y.S.3d 370, 372 (App. Div. 2020). In this case, the only element in dispute is damages. The district court believed that Moreno-Godoy's only path to proving damages was to show that he owned the $100,000. This was legal error.

Moreno-Godoy may pursue his breach-of-contract claim regardless of whether the funds belonged to him. Simply put, Moreno-Godoy and Al Kassar fulfilled their end of the bargain, but Kartagener did not. It follows that they may sue for breach of contract regardless of whether either of them owned the $100,000 consideration paid to Kartagener. See *Markson v. Markson's Furniture Stores*, 195 N.E. 824, 826 (N.Y. 1935); see also 22 N.Y. Jur. 2d Contracts § 62; 3 Williston on Contracts § 7:20 (4th ed.); Restatement (Second) of Contracts § 71(4).

Of course, Moreno-Godoy must still prove damages. In New York, it is well established that the non-breaching party may recover "general damages which are the natural and probable consequence of the breach." *Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319 (N.Y. 1989). These direct damages are usually expectation damages, measured "by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract." *Latham Land I, LLC v. TGI Friday's, Inc.*, 948 N.Y.S.2d 147, 151-52 (N.Y. App. Div. 2012) (citing *J.R. Loftus, Inc. v. White*, 85

1   N.Y.2d 874, 877 (N.Y. 1995); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (N.Y.

2   1971); Restatement [Second] of Contracts § 347). [2]

3         The district court seemed to believe that Moreno-Godoy was not damaged

4   by Kartagener's breach because his merits appeal of his original conviction was

5   unsuccessful. But even if Kartagener's performance "would [not] have done"

6   Moreno-Godoy "any good" in hindsight, that does not negate Moreno-Godoy's

7   ability to demonstrate expectation damages.

8         In New York, "the general rule is that damages for breach of contract are

9   computed at the time of breach." *J.M. Rodriguez & Co. v. Moore-McCormack Lines,*

10  *Inc.*, 299 N.E.2d 243, 244 (N.Y. 1973). In other words, a party's "breach and the

11  loss caused [is] fixed and determined . . . [when] plaintiff's cause of action

12  accrued." *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971). And it is from

13  that "time when the value to him of defendant's performance [is] to be

14  measured" because "[i]t was then that plaintiff was to be made whole." *Id*. As we

15  have previously noted, New York courts reject damages awards calculated with

---

[2]   Although Moreno-Godoy's submissions placed a greater emphasis on a theory of restitution
damages, he has also offered a theory of expectation damages throughout this litigation. In
his *pro se* complaint, for example, he wrote that he "wanted an additional third attorney with
a fresh set of eyes to work ... on [the] appeal." JA 26 (alterations omitted). He then explained
that the defendants' decision not to return the $100,000 left him "no money to hire additional
Counsel" and this "forced [him] to let Stavis solely represent him on appeal." JA 32. Indeed,
the district court initially understood Moreno-Godoy to be advancing a theory of expectation
damages. When it denied the defendants' motions to dismiss, it concluded that that Moreno-
Godoy had "adequately plead[ed]" that Stavis and GDB's breach "damaged Godoy by
costing him $100,000 *and by impeding Godoy's ability to use that money to choose and hire a
different attorney*." JA 80 (emphasis added).

1   the benefit of hindsight. *See Lucente v. IBM Corp.*, 310 F.3d 243, 262 (2d Cir. 2002)

2   (quoting *Aroneck v. Atkin*, 456 N.Y.S.2d 558, 559 (App. Div. 1982)).

3       In this case, Moreno-Godoy was deprived of Kartagener's legal assistance,

4   and he is entitled to damages for the value of those services if he can "show a

5   stable foundation for a reasonable estimate" of that value. *Tractebel Energy Mktg.,*

6   *Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (interpreting New

7   York law). And this remains true even if we believe that Kartagener's services

8   would not have changed the outcome of Moreno-Godoy's appeal. *See*

9   *Chamberlain v. Parker*, 45 N.Y. 569, 572 (1871) (providing that even when "it could

10   be seen that performance would have not benefited" a party who contracted for

11   construction services on his land, that party "would be entitled to recover the

12   value of the work and labor which the defendant was to perform, although the

13   thing to be produced had no marketable value").[3]

14       While the bulk of our analysis focuses on Moreno-Godoy's legal

15   arguments, we pause to address Stavis and GDB's implicit argument that they

---

[3] It is worth noting that New York law permits intended third-party beneficiaries to pursue breach-of-contract claims under certain circumstances. Hence, even if Moreno-Godoy was not a party to the Kartagener Agreement, which he is, and thus the money clearly had not come from him, Moreno-Godoy still would have an avenue to maintain breach of contract against these defendants. Under New York law, an intended third-party beneficiary is found where "reliance by the beneficiary [is] both reasonable and probable." *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 44, (N.Y. 1985). Intended third-party beneficiaries may sue for breach of contract where the contract "expressly contemplates that [the defendant] will undertake an obligation . . . on behalf of the [plaintiffs]." *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 57 (2d Cir. 2012). Moreno-Godoy could pass this test. At oral argument, Moreno-Godoy understandably rejected any arguments based on third-party beneficiary status, asserting forcefully his rights as a party to this contract.

earned the $100,000 through legal services rendered, and therefore are entitled to keep it. Contract law principles suggest otherwise. Stavis agreed to represent Moreno-Godoy and Al Kassar on all post-verdict matters in their criminal case for a flat fee of $125,000. No one disputes that the fee was paid in full, nor do Stavis or GDB argue that they entered into a binding modification of that agreement with Moreno-Godoy and Al Kassar. The existence of the Kartagener Agreement does not change the terms of the GDB Agreement, which required Stavis to litigate the case in the Second Circuit in exchange for $125,000, no more and no less. And New York regulations prohibit unilateral changes in representation agreements. New York Rule of Professional Conduct 1.5(b).

### B. Quasi-Contract Claims

In order to prevail on his additional claims, Moreno-Godoy must, however, prove that he owned the $100,000. As the district court recognized, his claims for unjust enrichment, money had, and constructive trust all sound in quasi-contract, a theory that "rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another*." State v. Barclays Bank of N.Y.*, 563 N.E.2d 11, 15 (N.Y. 1990). In fact, "money had" explicitly requires that the defendant "received money belonging to the plaintiff*." Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984) (citing *Miller v. Schloss*, 218 N.Y. 400, 409 (N.Y. 1916)). If Moreno-Godoy did not own the money, neither Stavis nor GDB could have been enriched "at the expense of" Moreno-Godoy by retaining these funds, and the quasi-contract claims would fail. *Barclays Bank*, 563 N.E.2d at 14-15 (dismissing the plaintiff's claim for unjust enrichment because it "never acquired a property

interest in [the funds] and cannot be said to have suffered a loss"); *see also Nat'l Bank of Com. v. Manufacturers' & Traders' Bank*, 25 N.E. 355, 356 (N.Y. 1890) ("The action cannot be sustained as in effect one for money had and received, as it does not appear that defendant received moneys belonging to the plaintiff, or to which it was entitled.").

### i. Evidence of Ownership

On our review of the record, we find the admissible evidence supporting Moreno-Godoy's claim that he owned the funds to be sufficient for his quasi-contract claims to reach a jury. The district court held that neither Moreno-Godoy nor Al Kassar were "competent" to testify as to ownership because they were in prison at the time of the transfer and therefore lacked first-hand knowledge. But regardless of where they were at the time of the transfer, it does not follow that they could not offer admissible testimony that the jury could consider in determining where the funds originated. A rule to the contrary could bar incarcerated people from providing valuable testimony based on their first-hand knowledge simply because some subsequent events transpired outside prison walls. And of course there is no rule requiring any one witness to provide a complete universe of evidence supporting a party's claim.

Defendants make much of the fact that Moreno-Godoy submitted conflicting evidence about which of his assets generated the $100,000 transfer. It is certainly true that Moreno-Godoy at one time suggested that it came from money that Al Kassar's family acquired by selling his property, and that he also suggested that he earned the money by working for Al Kassar, who simply held

it for him. Throughout this litigation, however, Moreno-Godoy has maintained that the money was his and a reasonable jury could believe that it was.[4]

Moreno-Godoy provided various sworn statements that in different degrees support his direct ownership testimony. First, in his initial sworn deposition, he testified that he asked Al Kassar's family and associates to sell some of his possessions in anticipation of future legal fees. Second, Al Kassar also testified that "the $100,000 came from the selling of property." JA 499.

Third, Moreno-Godoy argued in his initial motion for summary judgment that the funds paid to Kartagener included both his "past earnings as an employee of Al Kassar's company, Alkaport . . . and the proceeds of sales of his assets." Mem. of Law in Supp. of Pl.'s Mot. for Summary Judgment 4, Dist. Ct. Dkt. No. 124. In support of the former claim, Moreno-Godoy pointed to the portion of his deposition where he testified that after he entered into an employment contract with Alkaport and Al-Kassar addressed his salary, Moreno-Godoy told Al-Kassar to "just keep it, if I need anything, I'll ask for it." JA 351.

Fourth, while Habbal testified that she transferred the money from the sale of Moreno-Godoy's cars to his daughters, she further testified that Al Kassar told her that Moreno-Godoy's money which was to be transferred to Kartagener

---

[4] Moreover, this is not a case in which the only evidence for Moreno-Godoy's ownership of the funds is Moreno-Godoy's own shifting testimony. We have observed that when earlier "testimony is contradicted by evidence other than the deponent's subsequent affidavit, . . . the concern that the proffered issue of fact is a mere 'sham' is alleviated." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43-44 (2d Cir. 2000).

1    stemmed from his work for Alkaport. Finally, she at one point suggested that she

2    had also spoken directly to Moreno-Godoy in prison, who also asked that she

3    transfer the money. She recalled Moreno-Godoy saying "transfer my money to

4    [Kartagener]." *Id*. Even if Habbal's testimony is inadmissible to prove that

5    Moreno-Godoy owned the funds, it might be admissible to show that the only

6    person who ever claimed ownership of the funds transferred to Kartagener was

7    Moreno-Godoy.

8         Fifth, Moreno-Godoy offered a sworn declaration from Juan Rodriguez

9    Ocaña, a lawyer and former business associate of Alkaport who said he had

10   personal knowledge that "Mr. Moreno-Godoy worked for Alkaport for about ten

11   years. During that time, he did not draw a salary; instead the money he earned

12   was put in savings for him by the Al Kassar family." JA 274. Moreno-Godoy

13   supported this assertion that he worked for Alkaport with documentary

14   evidence, including a business card and work authorization, as well as a work

15   contract listing him as a "salaried" employee of Habbal's.[5]

---

[5] Moreno-Godoy did not place Ocana on his list of proposed witnesses in the parties' Proposed
Joint Preliminary Pre-Trial Order, which was submitted after the district court initially denied
the defendants' motions for summary judgment. That omission does not justify the district
court's failure to address this sworn declaration when granting the defendants' motion for
summary judgment. The declaration was discussed in Moreno-Godoy's summary judgment
submissions, and the declaration does not suggest that the testimony it contains would be
inadmissible at trial. The district court could have determined that Moreno-Godoy was not
planning to call Ocana to testify at the trial only because of the unusual procedural posture of
the case, which involved a second round of summary judgment motions subsequent to the
parties' trial preparations.

1    Taken together, we find this evidence sufficient to create a genuine

2  question of fact as to Moreno-Godoy's ownership of the relevant funds.

3  Accordingly, that question must be decided by a jury.

4    **C. Stavis's Personal Liability**

5    Finally, we are not persuaded that Stavis may not be held personally

6  liable in this case. New York Partnership Law § 26(2) generally shields partners

7  in limited liability partnerships ("LLP") from personal liability for actions taken

8  as part of the course of the LLP's business. Subsection (c), however, provides the

9  following exception:

10    [E]ach partner, employee or agent of a partnership which is a

11    registered limited liability partnership shall be personally and fully

12    liable and accountable for any negligent or wrongful act or

13    misconduct committed by him or her . . . while rendering

14    professional services on behalf of such registered limited liability

15    partnership.

16    If Moreno-Godoy's allegations are true, Stavis refused to return funds that

17  did not belong to him or to his firm. He also failed to provide a written

18  engagement letter entitling him to the $100,000 after Kartagener dropped out.

19  This may constitute unilateral changes to the scope of the agreed-to

20  representation in contravention of New York regulations. New York Rule of

21  Professional Conduct 1.5(b) (requiring attorneys to communicate to a client "the

22  scope of the representation" and "any changes in the scope of the representation

23  or the basis or rate of the fee or expenses"). Moreover, these actions could qualify

24  as a "wrongful act or misconduct" for which Stavis may be personally liable even

if the actions did violate a specific rule of professional conduct. *See Schuman v. Gallet, Dreyer & Berkey, L.L.P.*, 689 N.Y.S.2d 628, 629 (Sup. Ct. 1999) (holding that a partner in an LLP may be held personally liable for his role in "wrongfully disburs[ing]" a client's funds), *aff'd* 719 N.Y.S.2d 864 (App. Div. 2001) (holding that these allegations "sufficiently state claims against" that partner "individually").

That Stavis disbursed these funds to GDB and not to his personal bank account or that the Bar Disciplinary Committee did not discipline Stavis for these actions does not preclude his personal liability. *See Scarborough v. Napoli, Kaiser & Bern, LLP*, 880 N.Y.S.2d 800, 801-02 (App. Div. 2009) (holding that lawyers in an LLP may be held personally liable for specific "wrongful" conduct without discussing allegations that the lawyers personally benefited from the conduct or were disciplined as a result); *Connolly v. Napoli, Kaiser & Bern, LLP*, 817 N.Y.S.2d 872, 874-75, 879 (Sup. Ct. 2006) (same). Furthermore, the Bar Disciplinary Committee made no factual findings regarding Moreno-Godoy's complaint. It merely "determined to take no further action and closed the file." JA 299. Accordingly, we find that summary judgment for Stavis was unwarranted.

### D. Kartagener's Alternative Arguments

Kartagener argues that we may affirm the district court's decision to grant summary judgment in his favor for two additional reasons. First, Kartagener contends that, pursuant to the impossibility doctrine, he is not liable for breach of contract because he was unable to obtain a security clearance to review classified materials relevant to Moreno-Godoy's and Al Kassar's appeal and therefore could not represent them in the appeal. We agree with the district court that

1  summary judgment was not warranted on this ground. Even if the impossibility

2  doctrine could "excuse [Kartagener] performance," it could not relieve him

3  "from the obligation of repayment of the amount received." *Sokoloff v. Nat'l City*

4  *Bank of N.Y,* 204 N.Y.S. 69, 71 (App. Div. 1924); *accord Univ. of Minn. v. Agbo*, 673

5  N.Y.S.2d 812, 813 (App. Term 1998).

6        Second, Kartagener claims that he should face no consequences for his

7  failure to return his retainer fee to Moreno-Godoy because he gave the funds to

8  Stavis in his capacity as a lawyer—and therefore an agent—for Moreno-Godoy.

9  Again, the district court correctly declined to grant summary judgment to

10  Kartagener on this ground. Even if Kartagener's agency theory were sound as a

11  general matter, at this stage of the litigation the record does not indicate that

12  Kartagener gave the funds to Stavis because he believed Stavis was acting as an

13  agent for Moreno-Godoy. To the contrary, the record suggests that Kartagener

14  had no intention that the funds be handled in accordance with Moreno-Godoy's

15  wishes. The record lacks evidence that Kartagener attempted to contact Moreno-

16  Godoy, his client, before he transferred $90,000 of the $100,000 retainer fee to

17  Stavis, and Kartagener even admitted that he transferred the last $10,000 to

18  Stavis after Moreno-Godoy sent him a letter demanding that he not return the fee

19  to Stavis.

20        Accordingly, we find that summary judgment for Kartagener is

21  unwarranted.

22                     **CONCLUSION**

23        We **VACATE** the district court's decision and **REMAND** for further

24  proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

21